[No. H027491. Sixth Dist. Aug. 10, 2005.]

LIGHTHOUSE FIELD BEACH RESCUE, Plaintiff and Appellant, v.
CITY OF SANTA CRUZ et al., Defendants and Respondents,
CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, Real
Party in Interest and Respondent.

1174

## COUNSEL

Brandt-Hawley Law Group, Susan Brandt-Hawley and Paige J. Swartley for Plaintiff and Appellant.

Atchison, Barisone, Condotti & Kovacevich and John G. Barisone for Defendants and Respondents.

Bill Lockyer, Attorney General, Thomas Greene, Chief Assistant Attorney General, Mary E. Hackenbracht, Assistant Attorney General, John Davidson and Anita E. Ruud, Deputy Attorneys General, for Real Party in Interest and Respondent.

## OPINION

**ELIA, J.**—The principal issues in this case are whether the City of Santa Cruz (City) complied with the California Environmental Quality Act (CEQA) (Pub. Res. Code, § 21000 et seq.)[1] in preparing its initial study of the proposed revisions of the 1984 Lighthouse Field State Beach General Plan (revised general plan), adopting a negative declaration instead of preparing an environmental impact report (EIR), and approving the revised general plan. Appellant Lighthouse Field Beach Rescue (Beach Rescue), an unincorporated advocacy association, unsuccessfully petitioned for a writ of mandate on the ground that respondents City and City of Santa Cruz City Council (City Council) violated CEQA. The California Department of Parks and Recreation (Department) is named as a real party in interest.[2]

The petition alleged that the City "abused its discretion and failed to act in the manner required by law" by (1) failing to adequately "describe the environmental setting, including the impacts and extent of the current off-leash dog use at the Beach" in its initial study, (2) failing to certify an EIR since the "administrative record contains a fair argument that the amendments to the Plan may result in significant environmental impacts relating to but not limited to the continuing and increasing presence of off-leash dogs at the Beach . . . ," and (3) improperly deferring environmental analysis of "the impacts and mitigations for dog use at the Beach." Appellant had sought an order requiring respondents to set aside all approvals related to the revised general plan and to fully comply with CEQA, "including certification of an adequate environmental impact report and adoption of feasible project mitigations and alternatives based on findings supported by substantial evidence in the record."

On appeal from the denial of the writ petition, appellant Beach Rescue argues that (1) the initial study is inadequate because it failed to adequately describe the environmental setting and evaluate the environmental impacts of unleashed dogs at Lighthouse Field State Beach, (2) the City's approval of the amended plan and adoption of a negative declaration was improper because it could be fairly argued, based on substantial evidence, that "the project may have a significant effect on the environment," and (3) the City's deferral of unleashed dog issues to future environmental review resulted in prohibited "piecemeal" environmental review.

We reverse.

---

[1] All further statutory references are to the Public Resources Code unless otherwise specified.

[2] The Department joins in the respondent's brief filed by the City and City Council. Respondents City and City Council join in the Department's supplemental brief.

A. *Background*

Lighthouse Field State Beach (LF State Beach) is a state recreation unit of the state park system that has been designated as a state beach. (Cal. Code Regs., tit. 14, § 4753; see Cal. Code Regs., tit. 14, § 4302 [definition of "unit"]; see also Pub. Res. Code, §§ 5019.50 [classification by the State Park and Recreation Commission required], 5019.56 [subclassifications of state recreation units].) "State recreation units consist of areas selected, developed, and operated to provide outdoor recreational opportunities." (§ 5019.56.) "The Department of Parks and Recreation has control of the state park system." (§ 5001.)

The general plan for a unit of the state park system "serve[s] as a guide for the future development, management, and operation of the unit." (§ 5002.2, subd. (a).) "The resource element of the general plan shall evaluate the unit as a constituent of an ecological region and as a distinct ecological entity, based upon historical and ecological research of plant-animal and soil-geological relationships and shall contain a declaration of purpose, setting forth specific long-range management objectives for the unit consistent with the unit's classification . . . , and a declaration of resource management policy, setting forth the precise actions and limitations required for the achievement of the objectives established in the declaration of purpose." (§ 5002.2, subd. (b).)

The Department is permitted to enter into contracts with other governmental entities "for the care, maintenance, administration, and control by any party to the agreement, of lands under the jurisdiction of any party to the agreement for the purpose of the state park system." (§ 5080.30.) "The general plan for a unit of the state park system that is the subject of an agreement entered into pursuant to this article shall, in addition to the requirements set forth in Section 5002.2, specifically evaluate and define the manner in which the unit is proposed to be operated." (§ 5080.31, subd. (a).) Such a general plan must be reviewed "for a determination that the unit will be operated in a manner that generally meets the standards followed by the department in its operation of similar units, that enhances the general public use and enjoyment of, and recreational and educational experiences at, the unit, and that provides for the satisfactory management of park resources." (§ 5080.31, subd. (a).)

LF State Beach is located in the City and consists of a field area north of West Cliff Drive, a coastal area south of West Cliff Drive, and a

small pocket beach called "Its Beach." LF State Beach is operated and maintained by the City under contractual operating agreements.[3]

The original 1984 Lighthouse Field State Beach General Plan (original plan) contained a general management guideline, designed to implement the policy of protecting natural wildlife, that stated: "Pets should be restricted to leashes." The revised general plan establishes four management areas (coastal, field, monarch butterfly, and willow riparian) and replaces the general leash requirement with guidelines specific to each management area, including guidelines pertaining to dogs. In regard to the coastal management area, including Its Beach, and the field management area, the updated plan provides that "California Department of Parks and Recreation policies on dogs in State Parks will be utilized to determine dog use policies . . . ."

## B. *CEQA*

■ "CEQA embodies our state's policy that 'the long-term protection of the environment . . . shall be the guiding criterion in public decisions.' (§ 21001, subd. (d). See *Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 112 [62 Cal.Rptr.2d 612].)" (*Architectural Heritage Ass'n v. County of Monterey* (2004) 122 Cal.App.4th 1095, 1100 [19 Cal.Rptr.3d 469].) Generally, an EIR must be prepared whenever "there is substantial evidence, in light of the whole record before the lead agency, that a project may have a significant effect on the environment . . . ." (§ 21082.2, subd. (d); see § 21082.2, subd. (a).)

Under CEQA, a "project" includes "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] (a) An activity directly undertaken by any public agency. . . ." (§ 21065.) The implementing administrative guidelines (Cal. Code Regs., tit. 14, § 15000 et seq. (hereinafter Guidelines); see § 21083) clarifies that " '[p]roject' means the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment." (Guidelines, § 15378, subd. (a).) "An activity directly undertaken by any public agency,"

---

[3] The 1977 operating agreement between the State of California, acting through the Department, and the City and Santa Cruz County, provided that rules and regulations adopted by the local agency for the use and enjoyment of the property "shall conform to and be consistent with the rules and regulations adopted by [the State] and generally applicable to the State Park System, including said property." A 1977 agreement between the City and Santa Cruz County provided that the county would contribute financially to the cost of park operation and maintenance, and specified that the "City shall perform all functions relating to operation and maintenance of said public park in accordance with the long-term agreement and the Master Plan . . . ."

such as "the adoption and amendment of local General Plans or elements thereof," may be a "project." (Guidelines, § 15378, subd. (a)(1); § 21065.) " 'Project' is given a broad interpretation in order to maximize protection of the environment." (*McQueen v. Board of Directors* (1988) 202 Cal.App.3d 1136, 1143 [249 Cal.Rptr. 439].) It is undisputed that the adoption of the revised general plan for LF State Beach is a "project" within the meaning of CEQA.

" 'Lead agency' means the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment." (§ 21067; see Guidelines, § 15367 [defining "lead agency"].) It is undisputed that the City acted as the lead agency for purposes of CEQA.

A "significant effect on the environment" is defined as "a substantial, or potentially substantial, adverse change in the environment." (§ 21068; see Guidelines, § 15382.) A "significant effect on the environment" is "limited to substantial, or potentially substantial, adverse changes in physical conditions which exist within the area as defined in Section 21060.5." (§ 21151, subds. (a) & (b).) Section 21060.5 defines "environment" as "the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (See Guidelines, § 15360 ["environment" defined].)

██ A lead agency considering a nonexempt project generally must "conduct an initial study to determine if the project may have a significant effect on the environment" unless the lead agency "can determine that an EIR will clearly be required for the project . . . ." (Guidelines, § 15063, subd. (a).) The initial study as a standardized document "is largely a creature of the Guidelines . . ." and "CEQA refers to [an initial study] only glancingly (e.g., § 21080, subd. (c)(2))." (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1376 [43 Cal.Rptr.2d 170].) It is now well established, however, that an initial study is the preliminary environmental analysis (see Guidelines, § 15365) and its purposes include "[p]rovid[ing] the lead agency with information to use as the basis for deciding whether to prepare an EIR or negative declaration," "[e]nabl[ing] an applicant or lead agency to modify a project, mitigating adverse impacts before an EIR is prepared, thereby enabling the project to qualify for a negative declaration," and "[p]rovid[ing] documentation of the factual basis for the finding in a negative declaration that a project will not have a significant effect on the environment." (Guidelines, § 15063, subd. (c)(1), (2), (5).)

██ The lead agency is "responsible for considering the effects, both individual and collective, of all activities involved in a project." (§ 21002.1,

subd. (d).) "When assessing whether a cumulative effect requires an EIR, the lead agency shall consider whether the cumulative impact is significant and whether the effects of the project are cumulatively considerable. An EIR must be prepared if the cumulative impact may be significant and the project's incremental effect, though individually limited, is cumulatively considerable. 'Cumulatively considerable' means that the incremental effects of an individual project are significant when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects." (Guidelines, § 15064, subd. (h)(1); see § 21083, subd. (b)(2).)

■ When "[t]here is no substantial evidence, in light of the whole record before the lead agency, that the project may have a significant effect on the environment," the lead agency must prepare a negative declaration to that effect. (§ 21080, subd. (c)(1); Guidelines, §§ 15064, subd. (f)(3), 15070; see § 21064 ["negative declaration" defined]; Guidelines, §§ 15371 ["negative declaration" defined], 15071 [contents of negative declaration].) The lead agency may also prepare a mitigated negative declaration if appropriate.[4] (See § 21080, subd. (c)(2); Guidelines, § 15070.)

■ The CEQA process requires a period for public review of a proposed negative declaration or mitigated negative declaration. (§ 21091; Guidelines, § 15073.) The lead agency must consider all comments that are received within the public review period. (§ 21091, subd. (d)(1).)

■ "The decisionmaking body [of the lead agency] shall adopt the proposed negative declaration . . . only if it finds on the basis of the whole record before it (including the initial study and any comments received), that there is no substantial evidence that the project will have a significant effect on the environment . . . ." (Guidelines, § 15074, subd. (b).) "Prior to carrying out or approving a project for which a negative declaration has been adopted, the lead agency shall consider the negative declaration together with comments that were received and considered . . . ." (§ 21091, subd. (f); see Guidelines, § 15074, subd. (b).) The lead agency must prepare an EIR if it "is presented with a fair argument that a project may have a significant effect on the environment," even where it is also "presented with other substantial evidence that the project will not have a significant effect." (Guidelines,

---

[4] " 'Mitigated negative declaration' means a negative declaration prepared for a project when the initial study has identified potentially significant effects on the environment, but (1) revisions in the project plans or proposals made by, or agreed to by, the applicant before the proposed negative declaration and initial study are released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur, and (2) there is no substantial evidence in light of the whole record before the public agency that the project, as revised, may have a significant effect on the environment." (§ 21064.5.)

§ 15064, subd. (f)(1); see §§ 21080, subd. (d), 21082.2, subd. (d), 21151, subd. (a); *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68 [118 Cal.Rptr. 34, 529 P.2d 66].) This is because "an EIR is the key to environmental protection under CEQA." (*Id.* at p. 75.)

## C. *Appellate Review*

■ In a mandamus action challenging a public agency's quasi-legislative decision on the grounds of noncompliance with CEQA, "the inquiry shall extend only to whether there was a prejudicial abuse of discretion." (§ 21168.5; see Code Civ. Proc., § 1085 [a writ of mandate lies "to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station . . . "].) "Abuse of discretion is established if the agency has not proceeded in a manner required by law *or* if the determination or decision is not supported by substantial evidence." (§ 21168.5, italics added.)

■ The Legislature has declared: "[I]t is the policy of the state that noncompliance with the information disclosure provisions of this division which precludes relevant information from being presented to the public agency, or noncompliance with substantive requirements of this division, may constitute a prejudicial abuse of discretion within the meaning of Sections 21168 and 21168.5, regardless of whether a different outcome would have resulted if the public agency had complied with those provisions." (§ 21005, subd. (a).) The Legislature has further explained that it intends that the courts, in undertaking judicial review pursuant to section 21168.5, shall continue to follow the established principle that there is no presumption that error is prejudicial. (§ 21005, subd. (b).) Thus, "[f]ailure to comply with the information disclosure requirements constitutes a prejudicial abuse of discretion when the omission of relevant information has precluded informed decisionmaking and informed public participation, regardless whether a different outcome would have resulted if the public agency had complied with the disclosure requirements. [Citations.]" (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1198 [22 Cal.Rptr.3d 203].)

■ "[T]he substantiality of the evidence supporting such administrative decisions is a question of law" and "a court generally may consider only the administrative record in determining whether a quasi-legislative decision was supported by substantial evidence within the meaning of Public Resources Code section 21168.5." (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 573 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) In reviewing the lower court's ruling on a petition for traditional writ of mandate in a CEQA case, an appellate court is not bound by the trial court's determinations of law. (See *Gentry v. City of Murrieta, supra,* 36 Cal.App.4th at

pp. 1375–1376.) "On appeal, the appellate court's 'task . . . is the same as that of the trial court: that is, to review the agency's actions to determine whether the agency complied with procedures required by law.' [Citation.] The appellate court reviews the administrative record independently; the trial court's conclusions are not binding on it. [Citations.]" (*Ibid.*; see *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 722 [32 Cal.Rptr.2d 704].)

## D. *Administrative Record*

Despite the original general plan's guideline specifying that pets should be on leash, the City, through its Parks and Recreation Director, permitted off-leash dog use of Lighthouse Field and Its Beach during designated hours under the authority of section 8.14.200 of the Santa Cruz Municipal Code beginning in early 1993.[5] A memo from the City's Parks and Recreation Department evaluating the impact of the changes in dog use laws along West Cliff Drive and Lighthouse Field, dated August 31, 1993, indicated that "[i]t was the Department's hope the relaxation of the laws would lead to educate[d] dog owners which would in turn lead to cooperation with law enforcement and the potential for further relaxation of the laws." However, the memo acknowledged that the department's hopes had not been realized and recognized that there was a considerable and increasing problem with defecation throughout the field and Its Beach, dogs were frequently being seen off-leash during on-leash hours, and the "signage and pooper-scooper bag stations" had been "severely vandalized."

In a letter dated August 17, 1999, responding to a letter from a visitor complaining about off-leash dogs beyond the authorized time, the Chief Ranger of the Santa Cruz District of the Department explained that "Lighthouse 'State' park is administered by the City of Santa Cruz Parks Department under an operating agreement and is not patrolled by State Park Rangers or other staff. [The City's] dog policy is not the same as the State policy."

The planning process for the purpose of updating the original plan commenced in 2001. The City, through its Parks and Recreation Department, held a community workshop on November 15, 2001, to identify issues and receive public input. The City's Parks and Recreation Department developed an outline of "preliminary concepts." The draft "preliminary concepts" provided as to dog use that (1) dog use would be restricted in sensitive habitat areas, (2) off-leash dog use hours would be extended to sunrise to sunset in

---

[5] The City's Parks and Recreation Director is authorized under the City's municipal code to "designate certain beach and park areas, roads and trails for use by dogs." (Santa Cruz Mun. Code, § 8.14.200.)

nonsensitive areas of the field, and (3) off-leash dog use hours would be extended "on Its Beach during nonpeak use (late fall through spring)." The proposed preliminary concepts were presented to the public at a community workshop held in March 2002.

The City's Parks and Recreation Commission met in April, May, and June 2002 and the agenda items included update of original general plan and dog use. Numerous public comments regarding dog use, pro and con, were submitted to the City indicating strong feelings on both sides of the issue.

A posted order of the District Superintendent of the Santa Cruz District of the Department, effective August 10, 2002, authorized off-leash dog use of LF State Beach from sunrise to 10:00 a.m. and from 4:00 p.m. to sunset.[6] Under the order, between the hours of 10:00 a.m. and 4:00 p.m., dogs were permitted on leash in the field area and were not permitted on Its Beach.

The City's Parks and Recreation Department prepared an administrative draft of the revised general plan, which was circulated for review. This version explicitly allowed off-leash dog use in certain areas. After reviewing the draft, the District Superintendent of the Santa Cruz District of the Department, by letter dated January 29, 2003, recommended that all references to off-leash dog use be deleted and the following language be inserted: "California Department of Parks and Recreation policies on Dogs in State Parks will be utilized to determine dog use at Lighthouse [F]ield [S]tate Beach." A memo indicates that this recommendation was implemented and the revised general plan reflects those changes.

The City published a notice of intent to issue a negative declaration regarding the revised general plan. The notice stated that the public review period for the proposed negative declaration ran from February 5, 2003, through March 6, 2003. The state clearinghouse distributed the proposed negative declaration to selected state agencies and departments for review and comment.

The City received many comments from the public regarding the effect of dogs, especially unleashed dogs, on visitors' enjoyment and use of the LF State Beach. The comments included the following adverse remarks regarding dogs. "[T]he Field at present resembles an urban wasteland, a neglected backyard. Its primary present use and future if the draft report is accepted is

---

[6] The administrative regulations of the Department define "District Superintendent" as "the person in charge of an administrative district consisting of one or more units under control of the Department of Parks and Recreation." (Cal. Code Regs., tit. 14, § 4301, subd. (e); see § 5003.)

as a dog-running area." "[B]oth the field and the Its Beach have somehow become the exclusive domain of dogs. . . . [A]nyone who wants to stroll on Lighthouse Field and/or enjoy Its Beach had better be prepared to deal with piles of dog poop, scary unleashed and uncontrolled dogs, and their self-righteous owners." "Irresponsible dog owners have turned Its Beach into a dog toilet and dogs (have the) run of the beach even during the hours when dogs are not permitted. . . . I have been 'run over' and accosted by dogs on numerous occasions . . . . It is no longer pleasant to go to Its Beach even during the hours reserved for people without dogs because dogs are <u>always</u> there." "[T]he clear policy is to allow dogs off leash at the beginning and end of each day: and a defacto [*sic*] policy made by the City of allowing off-leash dogs in the park 24 x 7 by reason of non-enforcement of the existing law . . . ." "It is obvious and well-documented that the biggest single cause of sensitive habitat degradation in LFSB is the relatively recent introduction of huge numbers of dogs that are allowed to run free." "I paid a premium to live at my favorite park and beach (Its) but now I don't even use them because they are so dangerous and unpleasant due to uncontrolled dogs everywhere." "The current daily heavy input to the park of dog feces and urine, and uncontrolled dog behavior are harmful to the wildlife and environment and to people. The current dominant use of Lighthouse Field State Beach is as a mecca for off-leash dog use . . . . I and my children have personally been snarled at and chased 3 times by unleashed dogs in the park. . . . As a result I and many other people I know, including neighborhood dog owners, avoid using Lighthouse Field State Beach, including Its Beach and the field, solely because of the heavy off-leash dog usage of the park." "Due to confusion about the rules coupled with lax enforcement it has not been uncommon to see as many as 60 dogs running loose on the beach at one time. . . . The sands which are typically used by human visitors as a place to lay [*sic*] down and sit are a place where dogs prefer to defecate and urinate. . . . [¶] Other dog behaviors that are particularly unsuited to beaches where humans congregate: [¶] Constant barking . . . . [¶] Whining, yowling, crying and other forms of dog complaint. [¶] Fighting; chasing; digging (with flying sand in all directions); begging for food; stealing food that is left unattended; running over people's towels and blankets; shaking off water next to people other than owner, chasing . . . animals, wild or domesticated; . . . violating personal space of humans . . . and on and on."

The California Coastal Commission reviewed the proposed revised general plan, initial study, and negative declaration. In a letter dated March 5, 2003, it offered the following feedback regarding dogs: "Perhaps the most controversial and publicly discussed aspect of the Plan includes whether to continue to allow dogs at Lighthouse Field State Beach. . . . [T]he Plan should include provisions for more enforcement (by State or City officials or volunteers) of the dog restrictions to ensure that beach goers . . . are not inundated with

dogs during the prohibited hours. . . . Additional enforcement and signage would help ensure that those who do not wish to share the beach with dogs are able to do so during the peak beach-going times of day." It also recommended strengthening the language of the updated plan to ensure adequate protection of resources by, among other things, "prohibiting," rather than "discouraging," humans and dogs from entering seasonal pond areas and mandating, rather than suggesting, fencing to prevent seasonal ponds from excessive damage.

The City's planning commission agenda report, dated March 10, 2003, states: "The State directed that specific dog use policies should not be addressed in the LFSB General Plan in as much as this represented an operational issue to be dealt with at the local level as opposed to a policy based land use issue. Therefore, specific dog-use policies and regulations are not included in the Draft Plan."

In a letter dated March 12, 2003, the District Superintendent of the Santa Cruz District of the Department clarified that the Department's position was that detailed dog use policies should be developed at the local community level and not be included in the general plan and the City should "serve as primary decision maker regarding specific dog use issues" since the state beach is a locally operated and managed unit. The district superintendent advised the City: "Given that this State Park unit is a locally operated and managed unit, the more appropriate forum is for the City to serve as primary decision maker regarding specific dog use issues. The City's recommendation would then be forwarded to the local State Park District Superintendent. Upon concurrence with this recommendation an appropriate Posted Order regarding dog use policies would be issued."

The minutes of the City's Parks and Recreation Commission meeting on March 13, 2003, show that during the public hearing both the Director of the City's Parks and Recreation Department and the District Superintendent of the Santa Cruz District of the Department separately announced that the dog issues should be addressed at a future time. Following public comment, a motion carried to add language to the revised general plan acknowledging some users do not comply with dog use regulations at Its Beach and stating "it appears dog use at Its Beach has increased over the years." The City's Parks and Recreation Commission then passed a motion to recommend to the City Council that it adopt the negative declaration and approve the revised general plan.

The draft minutes of the City's planning commission meeting on April 3, 2003, show that a staff member of the City's Parks and Recreation Department announced that dog use policies would be discussed at a future date.

Planning Commissioner Louie "expressed she was very frustrated with being told that discussion regarding dog presence was not appropriate because the issue was going to be addressed at another time under a different forum and with being asked to adopt a Negative Declaration." She "questioned how consideration could be given to approve the initial study without knowing what the policies pertaining to dogs and the field would be." Planning Commissioner Foster "acknowledged the problem with prohibiting dogs from certain areas of the field and at the same time not being allowed to discuss it." Planning Commissioner Gaffney stated that she believed "allowing dogs off leash in any area results in a bigger impact than allowing them on leash in every area." The planning commission passed a motion, by a vote of five to two, to recommend to the City Council that it *not* adopt the negative declaration and revised general plan.

The City Council agenda report, dated March 10, 2003, for its April 22, 2003 meeting, stated in regard to the proposed adoption of the negative declaration and the revised general plan: "The intent of the revision to [the original plan] was to increase the protection of sensitive resources by restricting public use (people and dogs) to designated trails and viewing areas within the habitat areas. The Planning Commissioners expressed concern that the elimination of the words 'restricted to leashes', would imply that dogs would be allowed in the park off-leash. With this assumption, there was further concern that the Initial Study/Negative Declaration and the LFSB General Plan did not consider the impacts of off-leash dogs on the park areas not fenced or protected. [¶] The Initial Study recognized that dogs are present at the park and are allowed on and off-leash since 1993 per the approval of the Parks and Recreation Director and a posted order of the District of the [*sic*] Superintendent of the California Department of Parks and Recreation. As dogs are currently allowed in the park on and off-leash, the proposed change to [the Original Plan] will not introduce dogs into the park nor will it establish off-leash dog use as a new policy. Therefore, given the current 'baseline' environmental setting, the Revised LFSB General plan would not result in significant environmental impacts."

Following the public meeting of the City Council on April 22, 2003, the City Council unanimously passed a resolution adopting the negative declaration and adopting the revised general plan with text amendments to the plan that strengthened restrictions on dog use of environmentally sensitive areas. The City Council's April 22, 2003 resolution also adopted a related implementing amendment to the City's General Plan/Local Coastal Program and directed that the "City Manager or his designee" submit the amendment to the California Coastal Commission for final certification.

The new text included in the general plan by the City Council recognized that some users of LF State Beach do not comply with dog use regulations,

"[o]ff-leash dog use at Its Beach appears to have increased over the years," and dog use was "the most controversial and publicly discussed issue during this planning process." The new text acknowledges: "Dog use, in particular, generated the most community input. At these meetings, there was considerable community debate about off-leash dog use." It explains: "The California Department of Parks and Recreation considered specific dog use regulations to be an operational issue that is more appropriately addressed at the local level, and subsequently determined that specific dog use policies regarding leash regulations and hours of use should not be included in the General Plan."

E. *Adequacy of Initial Study*

Appellant Beach Rescue asserts that the City failed to proceed in the manner required by law by not properly preparing the initial study. Specifically, appellant charges that the initial study is inadequate because the City failed to fully set forth the baseline environmental setting and failed to fully analyze the impact of unleashed dogs.

1. *Content of Initial Study*

The initial study indicated that the habitat values of the field management area, which "features 26 1/2 acres of grassland with scattered Monterey cypress trees and seasonal ponds," are limited "[d]ue to the dominance of non-native species and other factors." The initial study determined that "[w]ildlife habitat values in the field area are moderated due to several factors," including "the relatively minimal extent of the willow riparian forest; degraded condition and seasonal nature of the drainage swale and ponds; abundance of non-native starlings which out compete native species for tree cavity nests; the fragmented and relatively isolated nature of the property from undisturbed open space areas; the urbanized residential setting; and the use of the site by people and dogs . . . ."

According to the initial study, the field's primary value was its "undeveloped open space character." The initial study explained that "Lighthouse Field has a long history of human disturbance and plant introductions." In regard to recreation and trail use authorized under the revised general plan, the initial study observed: "Informal pathways that are redundant or conflict with resource protection will be removed. [¶] Dog use will be consistent with the California Department of Parks and Recreation policy."

The initial study observed that "[n]on-native annual grassland is the most prevalent plant community at Lighthouse Field State Beach, occurring in large expanses in the western and central areas of the field." It identified only

one special status plant species, the artist popcorn flower, but anticipated no significant impacts. The initial study explained that the revised general plan "calls for continued, low-intensity, passive recreational uses within the southwestern portion of the site" where "artist's popcorn flower may exist along with other native grasses and plant species. One maintained east-west trail is located within this area."

The initial study recognized the presence of seasonal ponds within the field area. It explained that "[t]he habitat value of these seasonal ponds varies, depending on the associated wetland vegetation and disturbance by recreational use. Some of these ponds have been more heavily impacted by human and dog use . . . ." It concluded: "The revised General Plan supports protection and restoration of seasonal ponds. Both human and dog use are discouraged in these areas, and minimal or temporary fencing is suggested to prevent seasonal ponds from excessive damage."

The initial study recognized that the monarch butterfly and willow riparian management areas contain the most environmentally sensitive resources. The initial study observed: "Dog, as well as human, use is prohibited in the Monarch Butterfly and Willow Riparian Management Areas except on designated trails." It specified: "The revised General Plan calls for protection and enhancement of the monarch butterfly and willow riparian areas. Both human and dog use are prohibited in these areas except on designated trails. . . . [T]he revised General Plan seeks to protect the willow riparian Management Area[] by prohibiting all use, including human and dogs, closing unauthorized trails, and installing fencing to discourage access. The main east-west trail route would be maintained as a multi-use trail, including for dogs."

The initial study further stated: "The revised LFSB General Plan calls for prohibiting public access (including humans and dogs) into the riparian area except on designated trails. This will be accomplished through signage, fencing, and/or designated trails. Some pond areas at Lighthouse Field State Beach have been disturbed in the past due to human and dog use, although these areas have largely been devoid of vegetation and are of low habitat value. The proposed management guidelines for the Willow Riparian Management Area include installation of fencing as needed to discourage access into sensitive habitat areas, which would largely protect these areas from intrusion by either humans or dogs." It also indicated that the management guidelines provided for the closing of "unauthorized informal trails" "in order to promote recreational use on designated trails" and the use of "[s]ignage and fencing (such as split rail wood fencing)" "as necessary to discourage access into sensitive riparian areas."

In regard to the coastal management area, which encompasses "8 1/2 acres along the coastal bluffs" and all visitor facilities, the initial study recognized

there are "valuable natural resources along the coastal bluffs and near shore waters that must be protected" but "the primary intent of this area is to provide for visitor use." The initial study identified ongoing coastal bluff erosion as the main environmental concern. It stated that "[b]luff vegetation is dominated by iceplant . . . , a perennial non-native succulent" and "[w]hile iceplant is often utilized to minimize erosion, it provides little habitat value." It also reported that "[o]ther non-native weeds also occur along much of the bluff top."

The initial study reported that "[b]irds are the primary wildlife species utilizing the open field, coastal bluffs, and shoreline of Lighthouse Field State Beach" and indicated a resident species had been observed nesting in the grassland area during a recent survey. However, it noted that the field appeared to have "minor value as nesting habitat for long-distance migrants." It concluded that "[t]he proposed riparian restoration project would result in enhanced wildlife habitat and potential nesting in these areas . . . ."

The initial study concluded only four of the special status wildlife species known to exist in the vicinity were considered "significant users" within the boundaries of LF State Beach, namely monarch butterflies, peregrine falcons, merlins, and black swifts. As to monarch butterflies, the initial study reported: "The main habitat area is proposed to be protected with fencing and signage in order to keep people and dogs out of the protected overwintering habitat."

Regarding peregrine falcons and merlins, the initial study stated "Peregrines primarily nest on ledges and crevices of steep, inaccessible coastal bluffs and on cliff faces at inland locations" but "[c]urrently . . . do not nest on the coastal bluffs within the study area" and merlins "do not nest in California." It concluded that the revised general plan would "not result in new development or disruption of the existing Lighthouse Field grassland habitat" and "[p]roposed management guidelines seek to maintain and enhance existing habitat areas."

As to the black swift, the initial study stated that "in the past 5 years, no nests have been reported" but "potential nesting habitat is present along the bluffs within the study area." It also recognized that pigeon guillemots nest in cliff crevices and "are fairly common in subtidal and intertidal marine habitats and on rocky shores." However, since the revised general plan would not "result in new development on or adjacent to the coastal bluffs," the initial study concluded that the plan would "not result in impacts to black swifts or pigeon guillemots, should nesting be present."

In regard to water quality at Its Beach, the initial study acknowledged that "[c]oncerns have been raised about the impact of dog feces . . . ." The initial

study indicated that water quality sampling had been conducted at Its Beach. It determined that the project would not substantially degrade water quality. The initial study explained: "[R]eview of water quality testing reveals that bacterial levels at Its Beach are generally well within acceptable levels, and limited exceeedances [*sic*] have often occurred during winter storm periods after heavier storm periods. Dogs can contribute to higher bacterial levels, but other animals (sea lions, seabirds) are also potential sources. There is no current evidence that dogs are contributing significantly to infrequent exceedances of water quality. The City does provide bags for cleaning up after pets at Its Beach, as well as at the field area."

### 2. *Environmental Setting*

Appellant maintains that the initial study's description of the environmental setting is "fatally flawed" in that it "fails to provide a useful and accurate baseline" "by neglecting to address the extent, intensity, or effects of current dog use beyond citing on-leash and off-leash hours and conceding that unleashed dog use is a controversial problem." Appellant points to the brief statements in the initial study that describe the existing recreational uses. The initial study states that "the field area is also a highly valued recreational resource for walking and visitors with dogs" and indicates that dogs are permitted off-leash on Its Beach and in the field during specified hours "under a posted order issued by the District Superintendent of the California Department of Parks and Recreation."

Appellant Beach Rescue asserts that the initial study's description of the environmental setting is inadequate because it fails to make clear that "off-leash dogs have created an ever-increasing problem at Lighthouse Field." Appellant complains that the initial study's "environmental setting" component "provided no context against which to measure the ongoing, increasing, incremental effects of off-leash dog use" and failed to "review the damaging environmental effects relating to current use of Its Beach and Lighthouse Field by off-leash dogs, nor does it discuss the extent to which dog use has increased in recent years or in what manner and degree."

■ Under the CEQA Guidelines, an initial study must "contain in *brief* form: [¶] (1) A description of the project including the location of the project; [¶] (2) An identification of the environmental setting; [¶] (3) An identification of environmental effects by use of a checklist, matrix, or other method, provided that entries on a checklist or other form are *briefly* explained to indicate that there is some evidence to support the entries. . . . [¶] (4) A discussion of ways to mitigate the significant effects identified, if any; [¶] (5) An examination of whether the project would be consistent with existing zoning, plans, and other applicable land use controls; [¶] (6) The name of the

person or persons who prepared or participated in the initial study." (Guidelines, § 15063, subd. (d), italics added.) The Guidelines' sample environmental checklist form is indicative of the general level of brevity that is acceptable. (See Guidelines, Appen. G.)

The Guidelines define the term "environment," consistent with statute, to mean "the physical conditions which exist within the area which will be affected by a proposed project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance." (Guidelines, § 15360; see § 21060.5.) The Guidelines do not specially define "environmental setting" with regard to an initial study but do state in regard to EIR preparation: "An EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, from both a local and regional perspective. This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant." (Guidelines, § 15125, subd. (a), italics added.)

An EIR's description of the environmental setting must be sufficient to allow "an understanding of the significant effects of the proposed projects and its alternatives" but "no longer." (Guidelines, § 15125, subd. (a).) That description should place "[s]pecial emphasis" "on environmental resources that are rare or unique to that region and would be affected by the project" and "must permit the significant effects of the project to be considered in the full environmental context." (Guidelines, § 15125, subd. (c).)

■ However, the Guidelines merely require an initial study, in contrast to an EIR, to briefly identify the environmental setting. (Guidelines, § 15063, subd. (d)(2); cf. Guidelines, § 15125, subd. (a).) An initial study is only a "preliminary analysis" (Guidelines, § 15365) and the regulatory requirements regarding its contents are not as demanding as those imposed upon an EIR. (See Guidelines, § 15063, subd. (d); cf. Guidelines, § 15120 et seq.) "[A]n initial study is neither intended nor required to include the level of detail included in an EIR." (Guidelines, § 15063, subd. (a)(3).)

In this case, the initial study described the "environmental setting" with some specificity for several pages and set forth the existing site conditions, the existing facilities, and existing recreational uses. It contains a brief description of the existing physical conditions, including the topography and types of habitats and vegetation. It notes the existence of "non-native annual grasslands," "scattered Monterey cypress and eucalyptus trees," "[c]entral coast arroyo willow riparian forest, seasonal ponds, and associated wetland

vegetation," "scattered remnants of native grasses and wildflowers," a "mixed cypress/eucalyptus grove" serving as an "over-wintering site for monarch butterflies," and unpaved trails providing public access to the natural open space. The initial study also briefly mentions the use of the area by visitors with dogs. Appellant does not suggest that the identification of the existing physical conditions was inaccurate insofar as it went.

Most of the cases cited by appellant in support of its claim that the initial study was deficient in failing to provide an adequate description of the environmental setting involved a challenge to an EIR, not an initial study. (See e.g. *Friends of the Eel River v. Sonoma County Water Agency* (2003) 108 Cal.App.4th 859 [134 Cal.Rptr.2d 322]; *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99 [104 Cal.Rptr.2d 326]; *Riverwatch v. County of San Diego* (1999) 76 Cal.App.4th 1428 [91 Cal.Rptr.2d 322]; *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931 [91 Cal.Rptr.2d 66]; *Galante Vineyards v. Monterey Peninsula Water Management Dist.* (1997) 60 Cal.App.4th 1109 [71 Cal.Rptr.2d 1].) None of these cases demonstrate that the portion of the initial study's identifying the environmental setting was deficient.

Quoting *Fat v. County of Sacramento* (2002) 97 Cal.App.4th 1270, 1278 [119 Cal.Rptr.2d 402] (*Fat*), appellant asserts that "Guideline section 15125 'supplies the definition of "environmental setting" against which environmental impacts are measured at each of the three steps in the CEQA process' beginning with the Initial Study." In *Fat*, the County of Sacramento approved a negative declaration and conditional use permit allowing the opeation and expansion of an airport, which was "a privately owned public facility."

The sole issue in *Fat, supra,* 97 Cal.App.4th 1270 was whether the county had abused its discretion in considering the physical conditions that existed in 1997 when the application for a conditional use permit was submitted, rather than in 1970 when CEQA was enacted, as the baseline for its initial study. (*Id.* at pp. 1272–1275.) Although the airport had "developed over a period of nearly 30 years without County authorization" and "there was evidence of environmental damage during that period" (*id.* at p. 1281), the initial study "describe[d] the existing environmental setting" rather than some earlier environmental setting. (*Id.* at p. 1280.)

The appellate court in *Fat* found it significant that Guidelines section 15125, subdivision (a), had been amended to define "environmental setting" in the context of an EIR as "the physical environmental conditions in the vicinity of the project, as they exist at the time . . . environmental analysis is commenced, from both a local and regional perspective" and "[t]his environmental setting will normally constitute the baseline physical conditions by which

a lead agency determines whether an impact is significant" (Guidelines, § 15125, subd. (a); see *Fat, supra,* 97 Cal.App.4th at pp. 1277–1280.) The appellate court concluded that substantial evidence supported "the County's decision to use the 1997 baseline under the general rule set forth in section 15125, subdivision (a) of the Guidelines" for its determination that the proposed project would not result in significant environmental impacts (*id.* at p. 1281) and the county had proceeded in the manner required by law. (*Id.* at p. 1272.)

Guidelines section 15125 was used in *Fat* for the limited purpose of analyzing whether the lead agency had selected the proper reference point in time for assessing the environmental impact of the project. (*Fat, supra,* 97 Cal.App.4th at pp. 1277–1278.) Appellant agrees that the appropriate baseline time for the initial study in this case was 2001, not 1993 when unleashed dogs were first allowed at LF State Beach. The *Fat* opinion does not establish that Guidelines section 15125 controls the degree of detail necessary in an initial study's identification of the environmental setting.

The initial study in this case met the minimum requirements of Guidelines section 15063, subdivision (d)(2), of briefly identifying the baseline environmental setting. The City was not required, as part of a brief "environmental setting" description, to analyze the extent to which off-leash dog use had caused or contributed to the existing environmental conditions.

### 3. *Analysis of Impact of Unleashed Dogs*

Appellant Beach Rescue charges that the initial study failed to adequately analyze the impact of unleashed dogs on the environment given that the updated plan eliminated the original plan's guideline restricting pets to leashes. Appellant complains that "the [i]nitial study fails to recognize the obvious, well-documented fact that the biggest single cause of sensitive habitat degradation in the area is the recent introduction of huge numbers of dogs allowed to run free." It directs us to comments in the record indicating "huge numbers" of uncontrolled dogs have been allowed to run free, leash rules were frequently not enforced, and this situation has adversely affected other visitors to LF State Beach. It queries whether off-leash dogs have created environmental problems and charges that "[s]omeone reading the [i]nitial [s]tudy would have no idea that off-leash dogs have created an ever-increasing problem at Lighthouse Field." Appellant also complains that the initial study fails to "address the potential aesthetic and recreational changes that will result from unstudied fencing" and "there is no need for fencing if the current policy of dogs on leash is honored."

The City maintains that the updated general plan "did nothing to change applicable regulations governing off-leash dog use" and "did nothing to effect

a change in actual off-leash dog use at the park." It asserts that "[w]ith respect to off-leash dog use, the City Council therefore made a policy decision to do nothing more than preserve the long-established status quo."

In contrast to an EIR, an initial study is not required to consider or discuss alternatives to a project. (See Guidelines, § 15063, subd. (d) [contents of initial study]; § 21100, subd. (b)(4) [EIR must include alternatives to the proposed project]; Guidelines, § 15126.6 [consideration of alternatives to proposed project in EIR]; see also §§ 21002 [state policy that proposed projects should not be approved if there are feasible alternatives that would substantially lessen the significant environmental effects], 21002.1, subd. (a) [purpose of an EIR is to identify alternatives to the project], 21003, subd. (c) [state policy that an EIR emphasize feasible alternatives to projects].) Thus, the City was not obligated to evaluate alternatives to the fencing required under the updated plan in its initial study. However, insofar as appellant is arguing that the elimination of the leash requirement represents a policy shift, we think that is a completely fair characterization.

We asked the parties to discuss in supplemental briefing whether section 4312 of title 14 of the California Code of Regulations, which generally requires any dog brought into a unit under control of the Department to be "on leash of no more than six feet in length" (Cal. Code Regs., tit. 14, § 4312, subd. (e)), represents a Department policy on dogs in state parks. The City, City Council, and the Department maintain that this administrative regulation is not a policy level determination and, furthermore, "explicitly authorizes the promulgation of park-specific off-leash dog use regulations at the local level."[7] They reassert: "[I]t is the position of the City and State Parks that the Lighthouse Field State Beach off-leash dog use rules at issue in this proceeding were legally established in accordance with all applicable statutes, regulations and ordinances in 1993, and that off-leash dog use at the park has continued, as permitted by the 1993 rules, without interruption since those rules were adopted. . . . Thus, when applying the legally applicable 'existing environment/baseline' principles, it is readily apparent that the Administrative Record testimony and documentation cited by Appellant . . . are of limited relevance. None of that evidence is probative of the germane incremental difference between environmental conditions in place at the park as of the 2001 'baseline' date and ensuing environmental conditions that can be expected as a result of the General Plan Update's implementation." They

---

[7] Respondents point to other language in the regulation: "(a) No person shall permit a dog to run loose, or turn loose any animal in any portion of a unit, *except upon written authorization by the District Superintendent.* . . . [¶] (f) No person shall bring a dog into, permit a dog to enter or remain, or possess a dog: . . . [¶] (2) on any beach adjacent to any body of water in any unit *except in portions of units designated for dogs.*" (Cal. Code Regs., tit. 14, § 4312, italics added.)

are adamant that the City was entitled to view dog usage as part of the existing environmental baseline.

In addition to contending that application of environmental baseline principles to the "relevant record evidence" "validates the City's decision to prepare and adopt a Negative Declaration," respondents argue that new restrictions on dog use provide for "a net *decrease* in adverse environmental impacts that might be sustained as a result of off-leash dog use . . . ." They insist that, since there is no disagreement "the proper baseline is the park's 2001 environmental setting," the initial study "provided more than sufficient relevant information" and was legally adequate.

We find several flaws in respondents' analysis. First, respondents ignore the fact the general plan is the primary management document guiding the LF State Beach's future operation and management. (See § 5002.2, subd. (a).) It provides the framework for ongoing decisions regarding the management and operation of the LF State Beach. The revised dog guidelines unquestionably alter the management direction for the LF State Beach regarding off-leash dog use, which was previously set by the original plan. (See § 5002.2.) The fact that the City disregarded or failed to enforce the original leash guideline in the past does not change the scope of CEQA review in the present since the City is supposed to take its ongoing management direction from the general plan. The expectation is that revisions to the general plan will govern City's prospective actions and decisions regarding the LF State Beach, including those involving dogs. In habitat areas not identified as environmentally sensitive and accessible to dogs under the revised plan, the new open-ended dog guidelines provide no parameters regarding unleashed dog use and seemingly allow for unchecked increases in unleashed dog use, including the expanded use contemplated by the City in its "preliminary concepts."

Another flaw in respondents' reasoning is that the "environment" has been defined by statute and implementing administrative regulations to mean the existing physical conditions. (§ 21060.5; Guidelines, §§ 15360, 15382; see §§ 21100, subd. (d), 21151, subd. (b).) While the physical impacts of established levels of a particular use have been considered part of the existing environmental baseline (see *Fat, supra,* 97 Cal.App.4th 1270, 1272 [existing airport facility]; *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors, supra,* 87 Cal.App.4th 99, 102 [104 Cal.Rptr.2d 326] [existing water use]; *Fairview Neighbors v. County of Ventura* (1999) 70 Cal.App.4th 238, 242 [82 Cal.Rptr.2d 436] [existing traffic levels]; *Leonoff v. Monterey County Bd. of Supervisors* (1990) 222 Cal.App.3d 1337, 1349–1353 [272 Cal.Rptr. 372]; [existing traffic levels]), nothing in the baseline concept excuses a lead agency from considering the potential environmental impacts

of increases in the intensity or rate of use that may result from a project. In this case, as already stated, the elimination of the leash requirement in the primary management document not only permitted continued off-leash dog use at existing levels of impact in the areas accessible to dogs but also left the door open to continuing increases in such off-leash dog use. Yet, the City never indicated in its initial study that it had considered the potential environmental impact of the policy change regarding leashes. To the contrary, it appears the City incorrectly ignored the possibility of increases in visitors with off-leash dogs resulting from adoption of the revised general plan due to its view of the environmental baseline concept. "Where a physical change is caused by economic or social effects of a project, the physical change may be regarded as a significant effect in the same manner as any other physical change resulting from the project." (Guidelines, § 15064, subd. (e); see §§ 21080, subd. (e)(2), 21082.2, subd. (c).)

While the updated general plan should be commended for being more protective of the LF State Beach's environmentally sensitive resources than the original plan, we must reject the City's advocacy of a "net" environmental analysis. Any potential significant environmental effect triggers the EIR requirement (§ 21080, subds. (c) and (d)), even if the plan revisions together provide a "net" or overall positive for the environment. The Guidelines provide: "If the agency determines that there is substantial evidence that *any aspect of the project*, either individually or cumulatively, may cause a significant effect on the environment, *regardless of whether the overall effect of the project is adverse or beneficial*, the lead agency shall do one of the following: [¶] (A) Prepare an EIR or [¶] (B) Use a previously prepared EIR which the lead agency determines would adequately analyze the project at hand, or [¶] (C) Determine, pursuant to a program EIR, tiering, or another appropriate process, which of a project's effects were adequately examined by an earlier EIR or negative declaration. . . . The lead agency shall then ascertain which effects, if any, should be analyzed in a later EIR or negative declaration." (Guidelines, § 15063, subd. (b)(1), italics added.) "The lead agency shall prepare a negative declaration if there is no substantial evidence that *the project or any of its aspects* may cause a significant effect on the environment." (Guidelines, § 15063, subd. (b)(2), italics added.) Once a lead agency has identified a significant effect, a primary purpose of an initial study is to enable the lead agency "to modify a project, mitigating adverse impacts before an EIR is prepared, thereby enabling the project to qualify for a negative declaration." (Guidelines, § 15063, subd. (c)(2).)

This case is not like *Black Property Owners Assn. v. City of Berkeley* (1994) 22 Cal.App.4th 974 [28 Cal.Rptr.2d 305], which the City cites. In *Black Property Owners Assn.*, nonprofit property owner associations challenged the City of Berkeley's compliance with CEQA in updating the housing element of its general plan as statutorily mandated. (*Id.* at p. 978.)

"[T]he City conducted an initial study under CEQA to determine whether an EIR was necessary because the draft update contemplated possible construction of 747 additional housing units between 1990 and 1995. The initial study indicated that this new construction would not result in adverse environmental effects and would instead have beneficial effects. Based on this study, a negative declaration was prepared." (*Ibid.*)

The appellate court recognized: "Because general plans embody fundamental land use decisions that guide future growth and development of cities and counties, they have the potential for resulting in ultimate physical changes in the environment. . . . [W]hen a proposed amendment to a general plan is the subject of an initial study, in most cases the agency will not be required to assess the environmental effects of the entire plan or preexisting land use designations. Instead, the question is the potential impact on the existing environment of *changes* in the plan which are embodied in the amendment. [Citations.]" (*Black Property Owners Assn. v. City of Berkeley, supra,* 22 Cal.App.4th at p. 985.)

The appellate court determined the City of Berkeley had complied with CEQA in that instance and "the City's acknowledgment of its existing housing-related ordinances in its update was not an aspect of the project necessitating environmental review." (*Black Property Owners Assn. v. City of Berkeley, supra,* 22 Cal.App.4th at p. 986.) It explained: "Because the revision was a project as defined by CEQA and the possibility existed that it might have a significant effect on the environment, the City conducted the necessary initial study. Consistent with its duty to assess the effects on the physical environment of any proposed changes in the element, the initial study analyzed the potential impact of the contemplated new housing construction and concluded that beneficial environmental effects would result. [Fn. omitted.] Because no changes were proposed in the housing-related ordinances, no assessment of their environmental effect was required by CEQA." (*Id.* at p. 985.)

In *Black Property Owners Assn. v. City of Berkeley, supra,* 22 Cal.App.4th 974, the parties did not dispute that the new housing construction contemplated by the revised general plan would not have a potentially significant effect on environment. (*Id.* at p. 985, fn. 7.) Here, the environmental impact of omitting the leash guideline is disputed. Most significantly, in *Black Property Owners Assn.,* the existing housing-related ordinances were merely described in the general plan and the revisions did not affect them. (*Id.* at

p. 985.) In this case, the revisions in the general plan pertaining to the leashing of dogs will affect the City's enactments and rules governing dogs at the LF State Beach in that the City is expected to conform its management to the general plan.

This case has some similarity to *City of Redlands v. County of San Bernardino* (2002) 96 Cal.App.4th 398 [117 Cal.Rptr.2d 582], in which a mischaracterization of the project resulted in an inadequate initial study. In that case, the County of San Bernardino approved amendments to its general plan "relating to land use regulation of unincorporated territory located within a city's 'sphere of influence' " and adopted a negative declaration. (*Id.* at p. 403.) Two cities filed petitions for a writ of mandate on the ground that the county failed to comply with CEQA by not preparing an EIR. (*Ibid.*)

The county's initial study characterized the project as a clarification of the county's land use planning authority and development approval discretion in sphere of influence areas and stated that " '. . . [t]he wording changes proposed in the amendment are necessary to ensure that policies meant to promote cooperation with cities cannot be interpreted as a forfeiture of the authority of the County Board of Supervisors.' " (*City of Redlands v. County of San Bernardino, supra,* 96 Cal.App.4th at pp. 404, 406.) The lower court issued the writ of mandate after finding that "the amendments, instead of clarifying existing policy, substantially changed the County's land use policies pertaining to unincorporated territories within various spheres of influence," "the County failed to gather facts necessary to perform an adequate environmental analysis," and "substantial evidence supported a fair argument that the amendments may have a significant impact on the environment." (*Id.* at p. 404.)

The appellate court determined: "In essence, the amendments eliminated the requirement that the County give substantial weight to and even implement the standards provided in an affected city's general plan. [¶] . . . Under the new amendments, where a conflict between city and county standards exist, the County has granted itself discretion to override city standards in making decisions concerning land within that city's sphere of influence." (*City of Redlands v. County of San Bernardino, supra,* 96 Cal.App.4th at pp. 407–408.) The appellate court concluded: "[T]he initial threshold study is inadequate because it fails to provide sufficient evidence or analysis of the potential environmental effects of the amendments. 'The agency should not be allowed to hide behind its own failure to gather relevant data.' Although the amendments essentially indicate a movement away from a city's stan-

dards and a movement toward county's exercise of greater discretion, the County does not provide evidence to show how such a shift in policy would have little or no effect on the environment." (*Id.* at p. 408, fns. omitted.)

 The initial study in this case, while extensive and thorough in most respects, does not reflect that the City ever considered or assessed the effect of the revisions on future off-leash dog use. This situation is in keeping with respondents' staunch position that unleashed dog use was merely part of the existing environmental baseline. As indicated, they were correct only as to the existing levels of use but not as to any increases in such use that may be engendered by the revisions. Consequently, we are compelled to conclude the City failed to proceed in "a manner required by law." (§ 21168.5.)

 "When the informational requirements of CEQA are not complied with, an agency has failed to proceed in 'a manner required by law' and has therefore abused its discretion. (Pub. Resources Code, §§ 21168.5, 21005, subd. (a); *County of Amador v. El Dorado County Water Agency, supra,* 76 Cal.App.4th at p. 946; *Environmental Planning & Information Council v. County of El Dorado* (1982) 131 Cal.App.3d 350, 355 [182 Cal.Rptr. 317].)" (*Save Our Peninsula Committee v. Monterey County Board of Supervisors, supra,* 87 Cal.App.4th at p. 118.) Since we find the City failed to consider the whole of the project in its initial study, we turn to the question of prejudice. (See § 21005, subd. (b) ["no presumption that error is prejudicial"].)

Respondents maintain that, even if the initial study was deficient, it would be improper "to decertify the City's environmental determination" given the administrative record. Citing several cases, respondents suggest that a comprehensive administrative record may "cure" a defective initial study. They argue that the City had "sufficient information at the time of its Plan Update adoption to determine that it could appropriately, and legally, accept the Initial Study as adequate and adopt the subject Negative Declaration." Again, it points to "the incremental *decrease* in adverse environmental impacts that can be expected to ensue upon implementation of the Plan Update's habitat protection programs . . . ."

As we have already indicated, CEQA is not satisfied by a "net" analysis; nor can the question of prejudice be resolved by such analysis. We recognize that in a number of cases, several of which respondents have cited, appellate courts have indicated that a defective initial study does not necessarily require a reviewing court to find prejudice or mandate preparation of an EIR. (See *Silveira v. Las Gallinas Valley Sanitary Dist.* (1997) 54 Cal.App.4th 980,

992 [63 Cal.Rptr.2d 244] ["inadequate initial study does not automatically make an EIR necessary" and "when the agency bases its decision on more information than that contained in the initial study, the additional information may cure any defects"]; *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1996) 42 Cal.App.4th 608, 625 [49 Cal.Rptr.2d 494] [defective initial study does not necessarily require agency decisions to be overturned where those actions were based on public comments as well as initial study]; *Gentry v. City of Murrieta, supra,* 36 Cal.App.4th 1359, 1380 [the defect was remedied in the course of public hearings on the project]; *Leonoff v. Monterey County Bd. of Supervisors, supra,* 222 Cal.App.3d 1337, 1347–1348 ["where the agency decision is based on more information than the initial study, the additional information may cure any defects in the initial study"].) These cases, however, do not aid respondents since the administrative record does not establish that the omitted information was disclosed in the course of public review and considered in adopting the negative declaration and revised general plan. The administrative record discloses that early on it was decided that off-leash dog use policies would not be addressed in the general plan and those issues were viewed as not within the purview of the CEQA review of the updated plan.

In *Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215 [32 Cal.Rptr.2d 19, 876 P.2d 505], the Board of Forestry approved a lumber company's two timber harvesting plans covering old-growth forest, "finding that 'there will not be any significant adverse effect on old-growth-dependent wildlife species or habitat from the harvesting that will occur under these two plans.' " (*Id.* at p. 1219.) The California Supreme Court concluded that the board abused its discretion "when it evaluated and approved the plans on the basis of a record which lacked information regarding the presence in the subject areas of some old-growth-dependent species, information which both [the Department of Forestry and the Department of Fish and Game] had determined was necessary." (*Id.* at p. 1220.) The board had believed that the lumber company could not be required to provide the additional information and evaluated the plans "based solely on the information already in the record." (*Id.* at p. 1236.)

The Supreme Court determined that "the board failed to proceed in the manner prescribed by . . . CEQA" by evaluating and approving the timber harvest plans in the absence of site-specific data regarding old-growth-dependent species and site-specific recommendations regarding mitigation measures from the Department of Fish and Game. (*Sierra Club v. State Bd. of Forestry, supra,* 7 Cal.4th at p. 1236.) It stated that the board, through the Department of Forestry, had an obligation under CEQA to collect such data because the board could not identify environmental impacts without the information. (*Ibid.*) The court concluded that the failure of the board to

proceed as required by law was prejudicial because the absence of information "made any meaningful assessment of the potentially significant environmental impacts of timber harvesting and the development of site-specific mitigation measures impossible." (*Id.* at p. 1237.)

 "The failure to comply with the law subverts the purposes of CEQA if it omits material necessary to informed decisionmaking and informed public participation." (*County of Amador v. El Dorado County Water Agency, supra,* 76 Cal.App.4th at p. 946.) " 'CEQA places the burden of environmental investigation on government rather than the public.' " (*Gentry v. City of Murrieta, supra,* 36 Cal.App.4th at pp. 1378–1379.) "Where an agency fails to provide an accurate project description, or fails to gather information and undertake an adequate environmental analysis in its initial study, a negative declaration is inappropriate. ([*City of*] *Redlands* [*v. County of San Bernardino*], *supra,* 96 Cal.App.4th at pp. 406, 408.)" (*El Dorado County Taxpayers for Quality Growth v. County of El Dorado* (2004) 122 Cal.App.4th 1591, 1597 [20 Cal.Rptr.3d 224].)

While we conclude that the shortcomings of the initial study precluded fully informed decisionmaking pertaining to the revisions affecting the leashing of dogs, this conclusion does not imply any opinion regarding the necessity of an EIR. A prejudicial abuse of discretion may be found "regardless of whether a different outcome would have resulted if the public agency had complied with those provisions." (§ 21005, subd. (a).) As will be discussed below, the existing administrative record does not contain evidence supporting a fair argument that the revised general plan may have a significant effect on the environment. Once the informational requirements of a complete initial study have been met, the City as lead agency may again determine whether a negative declaration, a mitigated negative declaration, or an EIR is appropriate. (See § 21080.1, subd. (a).)

F. *No Fair Argument of Significant Effect Based on Existing Administrative Record*

Appellant Beach Rescue maintains that "the administrative record contains substantial evidence sufficient to support a fair argument that the implementation of the Amended Plan may have significant adverse environmental effects." Appellant asserts: "Among the documented environmental issues relating to unleashed dogs are the inconsistency of the Amended Plan with site natural resource and wildlife management, conflicts with various State Beach uses, impeded use, conflict with the stated goals of the General Plan, noise, dog waste, aggressive dogs, health and safety, aesthetics, impacts to the

riparian habitat, impacts to native grasses, interference with migratory and resident birds and nesting, interference with wildlife nursery sites, water quality, exposure to feces-borne bacteria, and impacts on the Monterey Bay Marine Sanctuary." Appellant also argues that the administrative record "presents a fair argument that the continued and increasing presence of off-leash dogs *may* have significant impacts on the unique biology and wildlife species at Lighthouse Field, and has the potential to reduce habitat of rare or endangered plants or animals . . . ."

Appellant directs us to a letter from Barney and Pamela, dated April 17, 2000, generally discussing the health risks of dog feces, safety risks of unleashed dogs to other visitors, the adverse impact of dogs on the recreational experience of other visitors in terms of noise, aesthetics, and personal safety and peace and quiet, and the adverse impact of dogs on habitats and wildlife in general. The letter cites to various Internet sources.

Appellant also directs our attention to several anecdotal accounts, including the following. Ben Korte submitted an e-mail, dated May 31, 2002, complaining that the shore birds, pheasant, hawk, migrant ducks, and snowy white egret were gone from Its Beach because they could not "co-exist with the numerous dogs." Grant Weseman submitted a comment, dated March 5, 2003, stating in part: "I think it is apparent, even to the casual observer, that dogs running loose, in a natural park-like setting have the capability to irreparably harm the habitat of wildlife species. The absence of many ground-feeding birds, rodents and other mammals in Lighthouse Field State Beach is a testament to that potential."

At the City Council meeting on April 22, 2003, Barney Elders stated: "We all know, if we go out there, that there's damage to vegetation, that the dogs chase the native animals. I used to go out there all the time and see huge colonies of quail. There are no quail left in the park anymore." At that same meeting, Gillian Greensite stated: "[T]he dogs are mostly doing destruction in the open pond area where we used to have migratory birds in those areas and now it is just trampled down with dog feet everywhere. There used to be 125 species of birds documented in this book, the Monterey Bay Shoreline Guide. I couldn't believe that there was no mention of the decline in bird use of the park."

As already discussed, the potential impact of the updated plan must be assessed against the existing environmental baseline. In addition, guidelines

concerning dogs must be considered in the context of the general plan as a whole, since the entire document provides the framework for future management and operation of the LF State Beach.

The revised general plan sets forth the general park-wide goals, which include "[p]rotect[ing] the open space character of this unique coastal headland," "[p]rotect[ing] and enhanc[ing] sensitive resources, including the monarch butterfly habitat and the willow riparian forest," and "restor[ing] and revegetat[ing] coastal bluffs, grassland areas, and seasonal ponds as feasible." The updated plan recognizes that certain portions of LF State Beach feature sensitive natural resources and require restrictions on public access and use.

In regard to the monarch butterfly management area, the new plan recognizes "the sensitivity of this site during the over-wintering season and the need to protect grove characteristics during the remainder of the year." It specifies that "only the lowest intensity level of public use is appropriate" and "[p]ublic access should be restricted within the primary clustering grove and immediately adjacent grassland areas where butterflies are often observed on the ground." The resource management guidelines for this management area call for "[a]ctively maintain[ing] and enhanc[ing] the primary clustering grove to ensure its suitability as an overwintering site for monarch butterflies" and "[l]imit[ing] public access, including human and dog use, in the main habitat area" and "[u]tiliz[ing] fencing and signs to demarcate the protected area." Those guidelines also state: "Install and maintain signs to inform the public to remain on designated trails and not to disturb butterflies."

The revised general plan also recognizes the environmental sensitivity of the willow riparian areas: "Because the carrying capacity of sensitive riparian areas for public use is limited, only the lowest intensity uses would be allowed. . . . Public access within this area would be provided on designated trails and observation areas. All public uses, including dogs, would be prohibited within the willow riparian vegetation, drainage channels and attached ponds." The resource management guidelines for the willow riparian management area include: "Ensure protection of the willow riparian vegetation, drainage and attached ponds by prohibiting human and dog use." They also provide for "[c]los[ing] unauthorized trails into the willow thickets and drainages" and "[i]stall[ing] fencing as needed to discourage access, human and dog use into the sensitive habitat area." Another guideline calls for "interpretative displays educating visitors about the values of coastal drainage systems" that includes "information about the importance of protecting these areas and preventing human and dog disturbance."

The revised general plan's guidelines for the field management area, as finally revised, specify: "Prohibit public access, including human and dogs, within the seasonal ponds through educational programs, and install fencing where needed." As finally revised, they also state: "Initiate protective measures to prevent further damage to seasonal ponds and enable wetland vegetation to re-establish, and install minimal or temporary fencing where needed."

The revised general plan further states: "A key goal of this Field Management Area is to maintain designated trails and close unauthorized informal pathways where appropriate." The guidelines for the field management area specifically provide for the closing of redundant informal pathways to allow the grassland to revegetate. A guideline for the coastal management area provides: "Enable public use in coastal bluff areas in a manner that ensures public safety and minimizes impacts to bluff resources."

The administrative record does not contain substantial evidence that the revisions pertaining to dogs may cause a potentially substantial adverse impact on the environment as measured against the existing environmental baseline. Visitors with both leashed and unleashed dogs have already been using the LF State Beach extensively. In addition, appellant's analysis overlooks the fact that the original plan permitted dogs in all parts of LF State Beach. The original plan's guidelines did not specify that visitors pick up their dogs' waste or otherwise control their dogs' behavior beyond having them on leash. The revised general plan is more protective than the original plan insofar as it restricts dogs from certain environmentally sensitive areas and seeks to educate the public regarding protecting these areas from human and dog disturbance. Nothing in the updated general plan condones failures to enforce leash or other dog use restrictions implementing the plan.

The administrative record does not suggest that the plan changes affecting dog use may have the potential to substantially degrade the *existing* scenic character or other *existing* qualities of the environment, create objectionable odors affecting a substantial number of people, result in a substantial temporary, periodic, or permanent increase in ambient noise levels *existing without the project*, reduce a wildlife species, cause a wildlife population to drop below self-sustaining levels, threaten to eliminate a plant or animal community, or reduce the number or restrict the range of a rare or endangered plant or animal. (See Guidelines, § 15065, subd. (a)(1) [mandatory findings of significance]; Guidelines, Appendix G, I, III, XI, XVII; see also §§ 21001, subd. (c), 21083, subd. (b)(1).) To the contrary, the record suggests that the revisions affecting dog use will be more protective of vulnerable habitat areas than the original plan.

 While evidence in the record suggests that recreational users vigorously disagree regarding the propriety of the dogs, leashed and unleashed, at the LF State Beach and that the presence of dogs may decrease the enjoyment of some visitors to the state park or deter others from visiting at all, these effects are essentially social. "Effects analyzed under CEQA must be related to a physical change." (Guidelines, § 15358, subd. (b).) A social or economic change in itself is not a significant effect on the environment. (Guidelines, §§ 15064, subd. (f)(6), 15382.) CEQA is not concerned with the updated plan's direct social effects that do not contribute to a secondary physical impact. (See Guidelines, §§ 15064, subds. (e) and (f)(6), 15131, subd. (a), 15358, subd. (b); see also § 21060.5; Guidelines, § 15360.)

The administrative record does reflect continuing public controversy over the desirability of dogs, especially off-leash, at LF State Beach and frustration with lax enforcement of leash rules, which the final text of the updated plan acknowledges to an extent. However, "[t]he existence of public controversy over the environmental effects of a project shall not require preparation of an environmental impact report if there is no substantial evidence in light of the whole record before the lead agency that the project may have a significant effect on the environment." (§ 21082.2, subd. (b); see Guidelines, § 15064, subd. (f)(4).) "Argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly inaccurate or erroneous, or evidence of social or economic impacts which do not contribute to, or are not caused by, physical impacts on the environment, is not substantial evidence. Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." (§ 21082.2, subd. (c); see § 21080, subd. (e)(2); Guidelines, § 15064, subd. (f)(5), (6).)

Appellant finally tries to bolster its "significant effect" argument by contending that the revised general plan is inconsistent with the City's General Plan/Local Coastal Program and, therefore, an EIR is required. It points to the sample initial study checklist provided by Appendix G to the CEQA Guidelines. (See Guidelines, § 15063, subd. (f) ["forms are only suggested;" "public agencies are free to devise their own format for an initial study"].) In the category of land use and planning, the checklist asks whether there is a "[c]onflict with any applicable land use plan, policy, or regulation of an agency with jurisdiction over the project (including, but not limited to the general plan, specific plan, local coastal program, or zoning ordinance) adopted for the purpose of avoiding or mitigating an environmental effect." (Guidelines, Appendix G, IX.)

First, an inconsistency between a project and other land use controls does not in itself mandate a finding of significance. (See § 21083, subd. (b); Guidelines, § 15065, subd. (a).) It is merely a factor to be considered in determining whether a particular project may cause a significant environmental effect. (See Guidelines, § 15063, subd. (d)(5) [initial study must contain brief examination of project's consistency with "zoning, plans, and other applicable land use controls"].) However, in this case, approval actions for the revised general plan include amendment of the City's General Plan/Local Coastal Program "to reflect the revised Lighthouse Beach State Park General Plan." Thus, amendment of the general plan/local coastal program is in effect part of the project being considered.

Appellant further contends that the revised general plan is inconsistent with section 5008.1 and this inconsistency "add[s] to the fair argument for an EIR." Nothing in the updated plan sanctions dog use, on or off leash, "[p]os[ing] a threat to public safety and welfare," "[c]reat[ing] a public nuisance," or "[p]os[ing] a threat to the natural or cultural resources of the unit or to the improvements at the unit" contrary to section 5008.1. (§ 5008.1, subd. (b).) Dog access to environmentally sensitive habitats is restricted under the new plan and the plan's overarching vision and goals include protecting and enhancing sensitive resources, which presumably will guide future management decisions pertaining to dogs.

Appellant also argues that "imposition of fences within the park to protect sensitive habitat from off-leash dogs will physically divide the current open space contrary to Appendix G section IX subd. (b)." Appendix G to the Guidelines actually asks, in regard to land use and planning, whether a project would "[p]hysically divide an established community." Appellant has not pointed to any evidence in the administrative record suggesting that recommended fencing would physically disrupt any plant or animal community.

As already mentioned, a primary goal under the updated plan is to "[p]rotect the open space character of this unique coastal headland." In regard to the coastal management area, the plan specifically provides: "Install and maintain railing along the coastal bluffs as needed. Safety railing should be designed to keep the public away from the cliff edges *while also allowing for views through the railing*." (Italics added.) In the field management area, the plan provides for the installation of fencing as needed to prevent public access within the seasonal ponds and the installation of minimal or temporary fencing as needed to protect seasonal ponds and wetland vegetation. In regard

to monarch butterfly management area, the plan provides for the utilization of "fencing and signs to demarcate the protected area" of the monarch butterflies' main habitat as it might vary from year to year. In regard to the willow riparian management area, the plan calls for the installation of fencing to protect sensitive habitat but states"[m]inimize the amount of fencing and ensure fence design is compatible with the natural area and the setting." Appellant has not pointed to any evidence that the limited fencing required under the updated plan would substantially impair the open space character of LF State Beach.

Appellant Beach Rescue has failed to show there is substantial evidence in the administrative record supporting a fair argument that the revised general plan may have a significant effect on the environment.

### G. *Piecemeal Environmental Review*

Appellant Beach Rescue asserts that the City engaged in improper piecemeal environmental review by deferring "unleashed dog issues." It is true that "CEQA contemplates consideration of environmental consequences at the ' "earliest possible stage, even though more detailed environmental review may be necessary later." ' (*Leonoff* v. *Monterey County Bd. of Supervisors*[, *supra*,] 222 Cal.App.3d 1337, 1346.) The requirements of CEQA cannot be avoided by piecemeal review which results from 'chopping a large project into many little ones–each with a minimal potential impact on the environment–which cumulatively may have disastrous consequences.' (*Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283–284 [118 Cal.Rptr. 249, 529 P.2d 1017]; *City of Antioch* v. *City Council* (1986) 187 Cal.App.3d 1325, 1333 [232 Cal.Rptr. 507].)" (*Rio Vista Farm Bureau Center* v. *County of Solano* (1992) 5 Cal.App.4th 351, 370 [7 Cal.Rptr.2d 307].) For example, "[w]here an individual project is a necessary precedent for action on a larger project, or commits the lead agency to a larger project, with significant environmental effect, an EIR must address itself to the scope of the larger project." (Guidelines, § 15165.) The prohibition against piecemeal review is the flip side of the requirement that the whole of a project be reviewed under CEQA. (See Guidelines, § 15378, subd. (a).)

Appellant's complaint regarding deferral of dog issues has been answered by our determination that the City as lead agency was required to consider in its initial study whether plan changes pertaining to dogs, including omission of the leash guideline, may potentially generate increased levels of off-leash dog use and result in adverse environmental effects.

The order denying the petition for a writ of mandate is reversed. The trial court is directed to issue a peremptory writ of mandate requiring the City to set aside its adoption of the negative declaration, its adoption of the revised general plan for LF State Beach, and its related actions and to take further action, consistent with this opinion, as necessary to comply with CEQA and the Guidelines. (See § 21168.9.)

City of Santa Cruz, et al., defendants and respondents, shall bear appellant's costs on appeal. Otherwise, parties shall bear their own costs on appeal.

Rushing, P. J., and Premo, J., concurred.