[No. C049919. Third Dist. Sept. 21, 2006.]

CALIFORNIA FARM BUREAU FEDERATION et al., Plaintiffs and Respondents, v.
CALIFORNIA WILDLIFE CONSERVATION BOARD et al., Defendants and Appellants;
LEROY V. TRAYNHAM et al., Real Parties in Interest and Respondents;
RICHARD J. MORA, Intervener and Respondent.

COUNTY OF COLUSA, Plaintiff and Respondent, v.
CALIFORNIA WILDLIFE CONSERVATION BOARD et al., Defendants and Appellants;
LEROY V. TRAYNHAM et al., Real Parties in Interest and Respondents;
CALIFORNIA FARM BUREAU FEDERATION et al., Interveners and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part II.

174

176

178

## COUNSEL

Bill Lockyer, Attorney General, Mary Hackenbracht, Assistant Attorney General, and Deborah A. Wordham, Deputy Attorney General, for Defendants and Appellants.

Gibson, Dunn & Crutcher, Alan N. Bick and Christeon J. Costanzo for Plaintiff and Respondent and for Intervener and Respondent California Farm Bureau Federation.

Brenda Washington Davis, John R. Weech and Ronda Azevedo Lucas for Plaintiffs and Respondents and for Interveners and Respondents California Farm Bureau Federation and Richard J. Mora.

Somach, Simmons & Dunn, Timothy M. Taylor, Kristen T. Castanos, Jacqueline L. McDonald; Henry E. Rodegerdts, County Counsel, for Plaintiff and Respondent County of Colusa.

No appearance for Real Parties in Interest and Respondents.

## OPINION

**CANTIL-SAKAUYE, J.**—This case addresses the California Wildlife Conservation Board's (WCB) approval of a project involving the conversion of agricultural land into wildlife habitat as categorically exempt from the California Environmental Quality Act (CEQA). The California Department of Fish and Game (DFG) and the WCB appeal the grant of a peremptory writ of mandate directing them, inter alia, to set aside the decision finding the Traynham Ranch project (Project) to be exempt from CEQA.[1] The DFG and

___

[1] CEQA is codified at Public Resources Code section 21000 et seq. All statutory references are to the Public Resources Code unless otherwise indicated. The state CEQA Guidelines are set forth in title 14, section 15000 et seq., of the California Code of Regulations. All further citations to the regulations will be referred to as the Guidelines. "[C]ourts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under

WCB also appeal the award of attorney fees to the County of Colusa (County) and to petitioners California Farm Bureau Federation, Colusa County Farm Bureau (together the Farm Bureau) and intervenor Richard Mora. We shall affirm the trial court's grant of a peremptory writ of mandate and the orders granting attorney fees.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2001, the DFG through the WCB (together the State Agencies) negotiated the purchase of a conservation easement on 235 acres of farmland (the property) owned by Leroy V. Traynham III (Traynham) in the County as the first acquisition/restoration project under the North Central Valley, Conservation Reserve Enhancement Program. WCB as the lead agency approved as part of the conservation easement a site specific waterfowl habitat management plan (Management Plan) which identified measures needed to convert the property from agriculture to habitat. The Project consisted of both the conservation easement and the management plan.

The property is adjacent to an existing riparian/wetland project in the Lower Colusa Trough and would expand a nearly contiguous 2,700-acre corridor of wetlands and riparian habitat along the Ridge Cut Slough that has been restored in recent years.

The property is located in the "General Agriculture" land use designation of the County's general plan and is zoned "Exclusive Agriculture." The property is located within the boundaries of an agricultural preserve and is designated on the important farmland series maps, pursuant to Government Code section 65570, as one or more of the following: prime farmland, farmland of statewide significance, unique farmland, and/or farmland of local importance. The property had been part of a Williamson Act contract with the County (Gov. Code, § 51200 et seq.) and at the time of the easement purchase by the State Agencies it was covered by a farmland security zone contract (Super Williamson Act Contract) with the County. (Gov. Code, § 51296 et seq.)[2] Under this Super Williamson Act Contract, Traynham had

---

CEQA." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278].)

[2] The California Land Conservation Act of 1965 (Gov. Code, § 51200 et seq.), also known as the Williamson Act, authorizes local governments to establish "agricultural preserves" consisting of lands devoted to agricultural and other compatible uses. (Gov. Code, § 51230; see *Sierra Club v. City of Hayward* (1981) 28 Cal.3d 840, 850 [171 Cal.Rptr. 619, 623 P.2d 180], superseded by statute as stated in *Friends of East Willits Valley v. County of Mendocino* (2002) 101 Cal.App.4th 191, 204 [123 Cal.Rptr.2d 708].) Once a preserve is established, the local government may enter into renewable contracts with owners of included agricultural land to restrict the use of the land for at least 10 years in exchange for favorable statutory property tax assessment standards. (Gov. Code, §§ 51240, 51242, 51244.) The act was the Legislature's

agreed to restrict the use of the property to production of food and fiber for commercial purposes and compatible uses. The property had been planted with row crops and rice and was planted with Sudan grass at the time of the appraisal for the easement purchase by the State Agencies.[3]

The State Agencies provided a project description of the acquisition of the conservation easement as requiring "approximately 225 acres of leveled agricultural fields to be restored to a mixture of seasonal and semi-permanent wetlands, grasslands, and forested wetlands." The conservation easement specifically precluded the cultivation of agricultural crops for commercial gain on the easement lands as a use inconsistent with the easement.

The conservation easement incorporated the management plan designed for the property and made part of the easement covenants. Such management plan required the "conversion" of the property from agricultural fields to wetlands. According to the management plan this would require: "1) reconstructing existing permanent levees in a meandering fashion such that all interior and exterior levees are 3 feet high and contain at least 5:1 side slopes (except where a levee borders a ditch, in which case the slope on the ditch side shall be 2:1, 2) constructing permanent interior levees (maximum 3 feet high, minimum 5:1 side slopes) to replace small rice dikes such that permanent interior levees are present at maximum intervals of every 12″ of elevational drop within each field, 3) developing or improving ditches as necessary to facilitate independent flooding and drainage of wetland units, 4) installing 'flashboard riser' water control structures (18–24″ diameter pipe, 36–48″ spill width) to allow the timely flooding/drainage of wetland units and precise control of wetland water depths, 5) constructing channels or 'swales' (30–80 feet wide, 12–24″ of excavation) that meander from the inlet to outlet structures, utilizing the resultant spoil to restore variable pond bottom topography by constructing underwater berms and hummocks, 6) developing small linear 'loafing bars' (20–60 feet long, 10–30 feet wide, minimum 5:1 side slopes, 0–12″ above the water level) and possibly some higher mounds for

response to "the rapid and virtually irreversible loss of agricultural land to residential and other developed uses . . . and . . . the disorderly patterns of suburban development that mar the landscape, require extension of municipal services to remote residential enclaves, and interfere with agricultural activities. [Citations.]" (*Sierra Club v. City of Hayward, supra,* 28 Cal.3d at p. 850, fn. omitted.) The Legislature in 2000, in an effort "to expand options available to landowners for the preservation of agricultural land" and "to encourage the creation of longer term voluntary enforceable restrictions within agricultural preserves" (Gov. Code, § 51296), added statutory provisions allowing rescission of Williamson Act contracts and simultaneous placement of the land in new farmland security zone contracts with an initial term of 20 years. (Gov. Code, § 51296 et seq.)

[3] According to the Columbia Encyclopedia (6th ed. 2001–05), Sudan grass is a type of grass sorghum used for pasture and hay.

duck blinds, 7) planting isolated clumps of hardstem bulrush (tules) throughout the wetland area, [and] 8) planting native willows and cottonwoods in areas that can be irrigated for the first two years." The cost for the Project, not including the cost of the conservation easement itself, was estimated at $111,140.

The Project would result in approximately 145 acres of wetlands and 80 acres of uplands. Some of the wetlands would be seasonal wetlands, but at least 15 acres would be semipermanent wetlands brood ponds, which would be flooded continuously during the spring and summer from at least March 15 through July 15.

The California Waterfowl Association (CWA) received a grant to fund the construction work. CWA submitted a work plan for the project which listed the following specific work to be done: "1) An existing 40 hp pump will be refurbished. 2) A 1500 ft pipeline will be installed to irrigate the southern upland field. 3) Levees will be refurbished or constructed and flashboard risers will be installed to control the application and management of water. 4) A catch basin will be constructed to take advantage of free water from the agricultural drainage ditch. 5) Approximately 15 acres of brood ponds will be constructed . . . . An irrigation swale will be cut from the pump, around the interior upland field and into the catch basin . . . . 6) Swales will be cut throughout the wetland units from inlet to outlet to facilitate water delivery and drainage. Excavated soil from the swales will be used to construct levees and diversify pond bottom topography. In addition to swales, ponds will be cut into the fields, varying in depth from 3 feet to 6 inches with an average of 12–18 inches in depth. 7) Tules, cottonwood trees and willow trees will be planted to restore native vegetation. 8) Small berms will be constructed in the southern upland field to facilitate irrigation. All uplands will be planted with a grass/vetch mix to establish dense nesting cover for locally nesting waterfowl, songbirds, and pheasants."

The DFG recommended the WCB approve the Project. The DFG took the position the acquisition of the conservation easement was exempt from CEQA under class 13 of the Guidelines' categorical exemptions for acquisitions for wildlife conservation purposes and the restoration efforts were exempt from CEQA under class 4 of the Guidelines' categorical exemptions for minor alterations of land to benefit fish and wildlife. The WCB approved the project on February 27, 2002, and on March 1, 2002, filed a notice of exemption asserting the project was exempt from CEQA under class 13.

The Farm Bureau filed a petition in the trial court against the State Agencies seeking a writ of mandate and injunctive relief alleging violations of CEQA and the Williamson Act. The County, Traynham, and the CWA were

named as real parties in interest. Richard Mora, an individual agricultural landowner in the County, was allowed to file a complaint in intervention similarly alleging violations of the Williamson Act and joining in the Farm Bureau's demand for relief under CEQA.[4] The County filed a cross-petition and cross-complaint against the State Agencies and Traynham alleging violations of the Williamson Act and failure to comply with County codes and ordinances. The trial court granted a preliminary injunction and stay against the State Agencies, Traynham, and the CWA. The trial court ordered the County's action bifurcated and stayed pending resolution of the Farm Bureau's petition.

After the State Agencies and Traynham amended the conservation easement to allow some commercial grazing of livestock on the property, the County dismissed its causes of action for violations of the Williamson Act, but filed a new writ petition alleging violations of CEQA by the State Agencies in approving the amendment to the easement. All parties stipulated to allow the Farm Bureau to intervene in the County's new petition alleging CEQA violations and to consolidate the two lawsuits.

The trial court ultimately ruled the Project was not exempt from CEQA and issued a peremptory writ directing the State Agencies to set aside the decision finding the project to be exempt, to refrain from any future approvals of the project unless made in compliance with CEQA, to use the condition of the property as it existed prior to the WCB's approval of the project on February 28, 2002, as the baseline for the environmental review, and in the interim to cease all activity relating to the project. The trial court granted the motions of the Farm Bureau, Mora, and the County for attorney fees on the CEQA issue.

The remaining claims of the petition, cross-petition, and complaint in intervention were settled and dismissed. Final judgment on the consolidated matters was entered and the State Agencies have appealed.

## DISCUSSION

### I.

### State Compliance With CEQA

A. *CEQA Overview and Standards of Review*

 "CEQA is a comprehensive scheme designed to provide long-term protection to the environment." (*Mountain Lion Foundation v. Fish & Game*

---

[4] Mora was represented by counsel for the Farm Bureau.

*Com.* (1997) 16 Cal.4th 105, 112 [65 Cal.Rptr.2d 580, 939 P.2d 1280] (*Mountain Lion Foundation*).) It "is to be interpreted 'to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' [Citation.]" (*Ibid.*) ■ And the Legislature has directed the secretary of the Resource Agency to promulgate a list of classes of projects that have no significant effect on the environment. A project falling within such a categorical exemption is not subject to CEQA. (*Id.* at p. 124.)

■ To achieve this objective, the Guidelines establish a three-step process to assist a public agency in determining which document to prepare for a project subject to CEQA. (Guidelines, § 15002, subd. (k).) In the first step, the lead public agency preliminarily examines the project to determine whether the project is statutorily exempt from CEQA, falls within a Guidelines categorical exemption or if " 'it can be seen with certainty' that [the] project will not have a significant effect on the environment. [Citations.]" (*Mountain Lion Foundation, supra,* 16 Cal.4th at pp. 112–113.) If so, no further agency evaluation under CEQA is required. The agency may prepare a notice of exemption. (Guidelines, §§ 15002, subd. (k)(1), 15062; see *Apartment Assn. of Greater Los Angeles v. City of Los Angeles* (2001) 90 Cal.App.4th 1162, 1171 [109 Cal.Rptr.2d 504], fn. omitted ["notice of exemption has no significance other than to trigger the running of the limitations period"]; Remy et al., Guide to the Cal. Environmental Quality Act (10th ed. 1999) p. 86 (hereafter Remy, CEQA Guide) [agency may, but need not, file notice of exemption].) If, however, the project does not fall within an exemption and it cannot be seen with certainty that the project will not have a significant effect on the environment, the agency takes the second step and conducts an initial study to determine whether the project *may* have a significant effect on the environment. (Guidelines, §§ 15002, subd. (k)(2), 15063; *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66] (*No Oil*).) ■ If the initial study shows there is no substantial evidence the project may have a significant effect on the environment or revisions to the project would avoid such an effect, the lead agency prepares a negative declaration. (§ 21080, subd. (c)(1); Guidelines, §§ 15002, subd. (k)(2), 15063, subd. (b)(2), 15070 et seq.) If the initial study shows "there is substantial evidence, in light of the whole record . . . that the project may have a significant effect on the environment," the lead agency must take the third step and prepare an environmental impact report (EIR).[5] (§ 21080, subd. (d); see § 21100; Guidelines, §§ 15002,

---

[5] "The EIR has been aptly described as the 'heart of CEQA.' [Citations.] Its purpose is to inform the public and its responsible officials of the environmental consequences of their decisions before they are made. Thus, the EIR 'protects not only the environment but also informed self-government.' [Citation.]" (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161], fn. & italics omitted.)

subd. (k)(3), 15080 et seq.; *No Oil, supra,* at p. 74; *Salmon Protection & Watershed Network v. County of Marin* (2004) 125 Cal.App.4th 1098, 1105 [23 Cal.Rptr.3d 321].)

A " '[s]ignificant effect on the environment' " is statutorily defined as "a substantial, or potentially substantial, adverse change in the environment." (§ 21068.) " 'Environment' means the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (§ 21060.5.) Combining these statutory definitions, a "significant effect on the environment" under CEQA is a substantial or potentially substantial adverse change in the physical conditions existing within the area affected by the project.

At issue here is the first step in the CEQA process, the determination of whether the project as defined by the State Agencies is subject to CEQA so that an initial study must be undertaken.

Judicial review of an agency's compliance with CEQA where no administrative hearing at the agency level was required is governed by section 21168.5, which limits judicial inquiry to whether there was a prejudicial abuse of discretion. (§ 21168.5; *No Oil, supra,* 13 Cal.3d at pp. 74–75, fn. 3.)[6] "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5.) We apply this same standard on appeal, reviewing the agency's action, not the trial court's decision. (*Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1183 [31 Cal.Rptr.3d 901].)

Where the specific issue is whether the lead agency correctly determined a project fell within a categorical exemption, we must first determine as a matter of law the scope of the exemption and then determine if substantial evidence supports the agency's factual finding that the project fell within the exemption. (*Fairbank v. City of Mill Valley* (1999) 75 Cal.App.4th 1243, 1251 [89 Cal.Rptr.2d 233] (*Fairbank*); see also *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1192 [61 Cal.Rptr.2d 447].) The lead agency has the burden to demonstrate such substantial evidence. (*Magan v. County of Kings* (2002) 105 Cal.App.4th 468, 475 [129 Cal.Rptr.2d 344]; *Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 114–115 [62 Cal.Rptr.2d 612] (*Davidon Homes*).)

---

[6] Section 21168.5 is the CEQA standard of review for traditional mandamus actions. Section 21168 governs administrative mandamus proceedings. "The distinction between these two provisions 'is rarely significant. In either case, the issue before the . . . court is whether the agency abused its discretion.' " (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 945 [91 Cal.Rptr.2d 66] (*County of Amador*).)

Once the agency meets this burden to establish the project is within a categorically exempt class, "the burden shifts to the party challenging the exemption to show that the project is not exempt because it falls within one of the exceptions listed in Guidelines section 15300.2." (*Davidon Homes, supra*, 54 Cal.App.4th at p. 115.)[7]

■ Where the agency fails to demonstrate the project is within a categorically exempt class, the project may nevertheless be exempt from CEQA if " 'it can be seen with certainty' that [the] project will not have a significant effect on the environment. [Citations.]" (*Mountain Lion Foundation, supra*, 16 Cal.4th at p. 113.) The Guidelines cover this concept in section 15061, subdivision (b)(3), called the commonsense exemption, which provides in part: "CEQA applies only to projects which have the potential for causing a significant effect on the environment. Where it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment, the activity is not subject to CEQA." The discussion accompanying this Guideline explains: "Subsection (b)(3) provides a short way for agencies to deal with discretionary activities which could arguably be subject to the CEQA process but which common sense provides should not be subject to the Act. [¶] This section is based on the idea that CEQA applies jurisdictionally to activities which have the potential for causing environmental effects. Where an activity has no possibility of causing a significant effect, the activity will not be subject to CEQA." (Remy, CEQA Guide, *supra*, appen. V, p. 874; see *Davidon Homes, supra*, 54 Cal.App.4th at pp. 112–113.)

In the case of the commonsense exemption, the agency has the burden to "provide the support for its decision before the burden shifts to the challenger. Imposing the burden on members of the public in the first instance to prove a possibility for substantial adverse environmental impact would frustrate CEQA's fundamental purpose of ensuring that government officials 'make decisions with environmental consequences in mind.' " (*Davidon Homes, supra*, 54 Cal.App.4th at p. 116, quoting *Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283 [118 Cal.Rptr. 249, 529 P.2d 1017].) "[T]he agency's exemption determination must be supported by evidence in the record demonstrating that the agency considered possible environmental impacts in reaching its decision." (*Davidon Homes, supra*, at p. 117; see *East Peninsula Ed. Council, Inc. v. Palos Verdes Peninsula Unified School Dist.* (1989) 210 Cal.App.3d 155, 171 [258 Cal.Rptr. 147].)

---

[7] We recognize there is some uncertainty regarding the nature of the challenger's burden of proof on the exception to the exemption, whether it is reviewed under the traditional substantial evidence standard or the "fair argument" standard. (*Santa Monica Chamber of Commerce v. City of Santa Monica* (2002) 101 Cal.App.4th 786, 796 [124 Cal.Rptr.2d 731]; *Fairbank, supra*, 75 Cal.App.4th at pp. 1259–1260.) We need not reach that issue in this case.

Keeping these principles in mind, we turn to the issues in this case.

B. *Class 13 Categorical Exemption*

■ "Section 21084, subdivision (a), mandates that the Guidelines include 'a list of classes of projects which have been determined not to have a significant effect on the environment and which shall be exempt from this division.' These categorical exemptions are found in article 19 (§ 15300 et seq.) of the Guidelines. 'Where a project is categorically exempt, it is not subject to CEQA requirements and "may be implemented without any CEQA compliance whatsoever." ' [Citation.] [¶] ■ In keeping with general principles of statutory construction, exemptions are construed narrowly and will not be unreasonably expanded beyond their terms. [Citations.] Strict construction allows CEQA to be interpreted in a manner affording the fullest possible environmental protections within the reasonable scope of statutory language. [Citations.] It also comports with the statutory directive that exemptions may be provided only for projects which have been determined not to have a significant environmental effect. [Citations.]" (*County of Amador, supra*, 76 Cal.App.4th at p. 966.)

In this case, the DFG took the position the acquisition of the conservation easement was exempt from CEQA under class 13 of the Guidelines' categorical exemptions for acquisitions for wildlife conservation purposes. (Guidelines, § 15313.) The WCB approved the Project and filed a notice of exemption asserting the project was exempt from CEQA under class 13.

At the time of the filing of the notice of exemption, section 15313 of the Guidelines provided, "Class 13 consists of the acquisition of lands for fish and wildlife conservation purposes including preservation of fish and wildlife habitat, establishing ecological reserves under Fish and Game Code Section 1580, and preserving access to public lands and waters where the purpose of the acquisition is to preserve the land in its natural condition." Section 15313 was amended in 2004 to read: "Class 13 consists of the acquisition of lands for fish and wildlife conservation purposes including *(a)* preservation of fish and wildlife habitat, *(b)* establishing ecological reserves under Fish and Game Code Section 1580, and *(c)* preserving access to public lands and waters where the purpose of the acquisition is to preserve the land in its natural condition." (Changes in italics.) The initial statement of reasons for regulatory action issued by the California Resources Agency (Resources Agency) noted the necessity for the revisions was "to avoid the misperception that the qualifying language at the end of example (c) regarding the purpose of the acquisition applies to all three examples of acquisitions for fish and wildlife conservation purposes." The "Final Statement of Reasons" issued by the Resources Agency for the amendments to this section indicate this revision

was intended to "provide structure and clarity to this section by labeling each of the three examples without changing any existing language or punctuation."[8]

Based on the amendment of section 15313 of the Guidelines and these statements indicating the revisions did not change, but clarified, the existing language, the State Agencies argue the acquisition of the conservation easement falls within the class 13 exemption even if the property is in other than a natural condition, i.e., it is farmland.[9] We agree the clarifying revisions and the normal "last antecedent rule" of construction[10] make clear that, even before the 2004 amendment when WCB filed the notice of exemption, land did not necessarily have to be in its natural condition to qualify for a class 13 exemption. We disagree, however, with the State Agencies' argument that section 15313 applies to the acquisition of land for conversion to wetlands, which conversion requires active construction and ongoing maintenance, such as the Project defined by the State Agencies here.

■ Section 15313 of the Guidelines provides three examples of acquisitions for conservation purposes that will qualify for categorical exemption under class 13. The first example is an acquisition for the *"preservation* of fish and wildlife habitat." (Guidelines, § 15313, italics added.) Webster's Third New International Dictionary (p. 1794) defines the verb to "preserve" variously as "to keep safe from injury, harm, or destruction," "to protect, save" or "to keep alive, intact, in existence, or from decay." These definitions connote, as the County suggests, "the safe keeping of an existing condition." For this first example in section 15313, that existing condition need not be land in its original "natural" condition, but it must be existing habitat. The language simply does not stretch to cover acquisitions for the purpose of physically constructing or creating and actively managing new wildlife habitat.

---

[8] We have granted the State Agencies' motion for judicial notice of this Final Statement of Reasons, including the summary and responses to comments received on the proposed amendments, submitted to the Office of Administrative Law on July 27, 2004, and of all the matters judicially noticed by the trial court.

[9] The State Agencies also argue several responses of the Resources Agency to comments by the California Department of Food and Agriculture and the California Farm Bureau Federation on the proposed amendments to section 15313 support its construction of section 15313. However, such responses indicate the purpose of the amendment to section 15313 was limited to clarification only and was not meant to address larger questions of CEQA's applicability to agricultural land.

[10] " 'A longstanding rule of statutory construction—the "last antecedent rule"—provides that "qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more remote." ' " (*Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 743 [110 Cal.Rptr.2d 828, 28 P.3d 876], quoting *White v. County of Sacramento* (1982) 31 Cal.3d 676, 680 [183 Cal.Rptr. 520, 646 P.2d 191].)

The State Agencies do not suggest this Project falls within either of the other two listed examples of acquisitions covered by class 13. The State Agencies do argue "the term 'including' indicates that there may be other circumstances, not specifically spelled out, when acquisition of land for fish and wildlife conservation purposes is exempt." Both the initial and final statement of reasons for the 2004 amendments to Guidelines, section 15313 by the Resources Agency describe the three acquisitions listed in section 15313 as "examples," suggesting the section is not intended to be limited to the three described acquisitions. However, even assuming other acquisitions for wildlife conservation purposes could be covered by the class 13 categorical exemption, such acquisitions would still have to be similar in kind to the listed examples.

■ We turn to the related maxims *noscitur a sociis* and *ejusdem generis* to divine the regulatory intent behind section 15313 of the Guidelines. *Noscitur a sociis* (literally, "it is known from its associates") means that a word may be defined by its accompanying words and phrases, since "ordinarily the coupling of words denotes an intention that they should be understood in the same general sense." (2A Sutherland, Statutory Construction (6th ed. 2000) § 47.16, pp. 268–269, fn. omitted.) ■ *Ejusdem generis* (literally, "of the same kind") (see *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1160 & fn. 7 [278 Cal.Rptr. 614, 805 P.2d 873]; *Engelmann v. State Bd. of Education* (1991) 2 Cal.App.4th 47, 57, fn. 11 [3 Cal.Rptr.2d 264]), means that where general words follow specific words, or specific words follow general words in a statutory enumeration, the general words are construed to embrace only things similar in nature to those enumerated by the specific words. (2A Sutherland, Statutory Construction, *supra*, § 47.17, pp. 272–282, fns. omitted.)

Here we have already discussed the first example given in section 15313 of the Guidelines, which covers "*preservation* of fish and wildlife *habitat*." (Italics added.) Even though the State Agencies do not claim the Project falls within the purview of the two other examples, these examples are helpful to understand the scope of the section 15313 exemption. The second example is the acquisition of lands for the purpose of "establishing ecological reserves under Fish and Game Code Section 1580." Fish and Game Code section 1580 provides for the protection of "threatened or endangered native plants, wildlife, or aquatic organisms or specialized habitat types, both terrestrial and nonmarine aquatic, or large heterogeneous nature gene pools for the future use of mankind through the establishment of ecological reserves." To establish such reserves, the statute authorizes the DFG to acquire land and nonmarine water, by a variety of methods, "suitable" for that purpose. This statute too appears to contemplate the acquisition of existing habitat or land already in a condition to provide habitat. Nothing in the language of the statute suggests land may be acquired for the purpose of *making* it suitable

for an ecological reserve. The third example given in section 15313 is even more restrictive; acquisition is limited to *"preserving access to public lands and waters where the purpose of the acquisition is to preserve the land in its natural condition."* (Italics added.) These examples narrow the construction that should be given the language "for fish and wildlife conservation purposes" in section 15313 to the acquisition of land already in a natural condition or providing existing habitat or ready to provide habitat.

 The evidence in the record regarding the Traynham Ranch shows the property has been actively farmed, growing row crops, rice and most recently Sudan grass. It is not existing wetland habitat. The purpose of the acquisition is to convert the property into a habitat, not to preserve a natural condition *or existing habitat.* There is no evidence in the record that the property will provide wildlife habitat without the construction and active management contemplated by the management plan.[11] We do not view the evidence that waterfowl and shorebirds already occasionally feed in the winter on the thousands of acres of rice fields in the area as substantial evidence the property itself is existing habitat so as to come within the class 13 exemption.

The State Agencies have not met their burden to show by substantial evidence the Project comes within the class 13 categorical exemption. The WCB abused its discretion in finding this Project exempt under the class 13 categorical exemption.

C. *Class 4 Categorical Exemption*

 In briefing the merits of the CEQA issues before the trial court, and now again on appeal, the State Agencies assert that the improvements required by the management plan for the conservation easement on the property were exempt under the Guidelines' class 4 categorical exemption. (Guidelines, § 15304.) Farm Bureau complains this exemption was not identified in the notice of exemption filed by the WCB after approval of the Project. However, it is clear a notice of exemption is not mandatory and its only effect when filed is to start the statute of limitations running. (Guidelines, §§ 15002, subd. (k)(1), 15062; see *Apartment Assn. of Greater Los Angeles v. City of Los Angeles, supra,* 90 Cal.App.4th at p. 1171; Remy, CEQA Guide, pp. 84–87.) Therefore, the fact the WCB listed the Project as exempt only under class 13 and not class 4 would not necessarily preclude

---

[11] As the project defined by the State Agencies in this case includes acquisition of the conservation easement incorporating the management plan for the "conversion" of the property, we need not consider and do not express an opinion on whether a pure acquisition of agriculture land with the intent to cease commercial farming on the land to passively allow it to return to a natural condition would be covered by any existing categorical exemptions. That is not what is at issue here.

the WCB from defending its exemption determination by asserting other categorical exemptions, at least where there is no claim or showing of prejudice. (Compare *McQueen v. Board of Directors* (1988) 202 Cal.App.3d 1136, 1143–1147 [249 Cal.Rptr. 439], [notice of exemption improperly used, incomplete and misleading] (*McQueen*), disapproved on other grounds in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 570 [38 Cal.Rptr.2d 139, 888 P.2d 1268], with *Centinela Hospital Assn. v. City of Inglewood* (1990) 225 Cal.App.3d 1586, 1600–1601 [275 Cal.Rptr. 901] [notice of exemption with inaccurate project description upheld].)

▪ The County complains the State Agencies' combination of two separate categorical exemptions to cover the Project is an improper segmentation of the project. The CEQA Guidelines define a " 'project' " to mean "the whole of an action." (Guidelines, § 15378, subd. (a).) It would be improper for an agency to divide a project into separate parts to avoid CEQA review. (*McQueen, supra*, 202 Cal.App.3d at pp. 1143–1144.) However, where the agency considers the project as a whole and determines the combined effect of two exemptions places the entire project outside the scope of CEQA, no improper segmentation has occurred. (See *Surfrider Foundation v. Cal. Coastal Com.* (1994) 26 Cal.App.4th 151, 155–156 [31 Cal.Rptr.2d 374] [combination of statutory and categorical exemption placed project outside purview of CEQA].)

The problem here is the acquisition of the land does not fall within the class 13 categorical exemption identified by the State Agencies and the construction work identified in the management plan for this Project, further identified by the work plan submitted by CWA, does not fit within the class 4 categorical exemption for minor alternations to land.

"Class 4 consists of minor public or private alterations in the condition of land, water, and/or vegetation which do not involve removal of healthy, mature, scenic trees except for forestry and agricultural purposes." (Guidelines, § 15304.) Examples given by section 15304 include, but are not limited to, (a) grading on land with a slope of less than 10 percent, (b) new gardening or landscaping, including the replacement of existing conventional landscaping with water efficient or fire resistant landscaping, (c) filling of earth into previously excavated land with material compatible with the natural features of the site, (d) minor alterations in land, water, and vegetation on existing officially designated wildlife management areas or fish production facilities, which result in improvement of habitat or greater fish production, (e) minor temporary use of land having negligible or no permanent effect on the environment, such as carnivals or Christmas tree sales, (f) minor trenching and backfilling where the surface is restored, (g) maintenance dredging where the spoil is deposited in an authorized spoil area, (h) the creation of bicycle

lanes on existing rights-of-way, and (i) fuel management activities within a certain distance of structures to reduce the volume of flammable vegetation meeting with some limitations. (§ 15304.)

 The State Agencies claim the proposed improvements to the property here "easily fall within the definition of 'minor alterations to land.' " The State Agencies suggest the alterations are consistent with the type of minor alterations to improve habitat described in subdivision (d) of section 15304. We disagree. First, subdivision (d) of section 15304 covers minor alterations to improve habitat "on existing . . . designated wildlife management areas or fish production facilities." The property here is not an existing wildlife management area or fish production facility. Second, the language of subdivision (d) reasonably suggests the kinds of activities exempted are those minor alterations, which improve existing wildlife habitat, not the creation of habitat. Finally, and most fundamentally, the class 4 exemption applies to only "minor" alterations, which this Project is not. The management plan calls for, among other things, a change in both the height and slope of existing levees, the construction of new permanent interior levees to replace small rice dikes, the construction of 30- to 80-foot-wide and one- to two-foot-deep swales or channels meandering throughout the property, the digging of ponds of up to three feet in depth in addition to the swales, the construction of 20- to 60-foot-long and 10- to 30-foot-wide loafing bars, plus some higher mounds for duck blinds, the construction of a catch basin, using the excavation spoil to construct what will become underwater berms and hummocks, the installation of 1,500 feet of pipeline plus a number of flashboard risers, and the planting of new riparian vegetation, including trees. The work will result in 15 acres of new semi-permanent ponds, which will require regular management and maintenance. The work will clearly alter existing drainage patterns and elevations of the land. It will change the nature of the land from level fields to wetlands. This is not a "minor" physical alteration to the land as exemplified by the kinds of examples listed in section 15304. "Exemption categories are not to be expanded beyond the reasonable scope of their statutory language." (*Mountain Lion Foundation, supra,* 16 Cal.4th at p. 125; see *Dehne v. County of Santa Clara* (1981) 115 Cal.App.3d 827, 842 [171 Cal.Rptr. 753]; see *Myers v. Board of Supervisors* (1976) 58 Cal.App.3d 413, 425 [129 Cal.Rptr. 902].)

The State Agencies have not met their burden to show this Project falls within the class 4 categorical exemption.

D. *Class 25 Categorical Exemption*

In a footnote in their opening brief in the section discussing the class 13 categorical exemption, the State Agencies assert, without substantive analysis

or supporting citations to the record and authorities, the Project is also exempt under the class 25 categorical exemption (Guidelines, § 15325). We may disregard arguments not properly presented under appropriate headings as required under rule 14(a)(1) of the California Rules of Court (*Heavenly Valley v. El Dorado County Bd. of Equalization* (2000) 84 Cal.App.4th 1323, 1345, fn. 17 [101 Cal.Rptr.2d 591]) and may treat as forfeited arguments merely asserted without support. (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [21 Cal.Rptr.2d 834].) However, even if we were to reach this issue, we would conclude this project is not categorically exempt under class 25.

Guidelines, section 15325 provides a categorical exemption for "Transfers of Ownership in Land to Preserve Existing Natural Conditions and Historical Resources[.]" Section 15325 states: "Class 25 consists of the *transfers of ownership interests* in land in order to preserve open space, habitat, or historical resources. Examples include but are not limited to:

"(a) Acquisition, sale, or other transfer of areas to preserve the existing natural conditions, including plant or animal habitats.

"(b) Acquisition, sale, or other transfer of areas to allow continued agricultural use of the areas.

"(c) *Acquisition*, sale, or other transfer *to allow restoration of natural conditions, including plant or animal habitats.*

"(d) Acquisition, sale, or other transfer to prevent encroachment of development into flood plains.

"(e) Acquisition, sale, or other transfer to preserve historical resources.

"(f) Acquisition, sale, or other transfer to preserve open space or lands for park purposes." (Italics added.)

Section 15325 by its terms covers only acquisitions, sales or other transfers of ownership interests for particular purposes. It does not cover anything else. Therefore, *even if* we were to decide that the acquisition of the property in this case could be covered by section 15325, which we do not, the exemption would not cover the Project as defined by the State Agencies with its management plan component requiring significant construction.

The State Agencies have not met their burden to show the Project in this case was categorically exempt under Guidelines section 15325.

E. *The Commonsense Exemption*

 Even though the State Agencies have failed to bring the Project within the scope of any statutory or specific categorical exemption, the Project may nevertheless be exempt from CEQA if " 'it can be seen with certainty' that [the] project will not have a significant effect on the environment. [Citations.]" (*Mountain Lion Foundation, supra,* 16 Cal.4th at p. 113.) In the language of the Guidelines' commonsense exemption: "Where it can be seen with certainty that there is *no possibility* that the activity in question may have a significant effect on the environment, the activity is not subject to CEQA." (Guidelines, § 15061, subd. (b)(3), italics added; see *No Oil, supra,* 13 Cal.3d at p. 74 [discretionary activity having no possibility of causing significant effect not subject to CEQA].) If, however, there *is* a reasonable possibility that a proposed project will have a significant effect upon the environment, then the lead agency must conduct an initial study. (*Wildlife Alive v. Chickering* (1976) 18 Cal.3d 190, 206 [132 Cal.Rptr. 377, 553 P.2d 537]; *Pistoresi v. City of Madera* (1982) 138 Cal.App.3d 284, 285 [188 Cal.Rptr. 136].)

A remote or outlandish possibility of an environmental impact will not remove a project from the commonsense exemption, but if legitimate, reasonable questions can be raised about whether the project might have a significant impact, the agency cannot find with certainty the project is exempt. (*Davidon Homes, supra,* 54 Cal.App.4th at pp. 117–118.) The commonsense exemption is "reserved for those 'obviously exempt' projects, 'where its absolute and precise language clearly applies.' " (*Id.* at p. 117, quoting *Myers v. Board of Supervisors, supra,* 58 Cal.App.3d 413, 425.) The lead agency has the burden to show the project comes within the commonsense exemption. (*Davidon Homes, supra,* at p. 116.)

In this case, the State Agencies claim the Project will not have adverse environmental effects. The State Agencies strenuously argue a mere change in use of land from agriculture to wildlife habitat is not of itself an adverse environmental impact under CEQA, but has only a potential socioeconomic impact, which cannot be considered by itself to be a significant effect on the environment bringing the Project within CEQA. The State Agencies claim appendix G to the Guidelines, which provides an optional method of considering whether impacts to agricultural resources are significant environment effects, does not require a conclusion that a change in land use from agriculture to habitat is an environmental impact, that wetlands would be an

"open-space" use consistent with the Williamson Act, that any conflict with the County general plan designation or zoning ordinance is a land use issue, but not "necessarily" a CEQA issue, and that case law does not support a conclusion that a restoration of agricultural land to habitat is an adverse impact. Describing the environmental benefits of changing the use of agricultural land to habitat, the State Agencies contend this Project does not cause a significant adverse effect on the environment.

These arguments are premised on an underlying factual assumption that this Project involves merely a change in the use of the property from agriculture to habitat. In fact, this Project is not a mere passive change in use, a cessation of farming on the property. This Project involves the physical reshaping of the land to create wetlands and uplands for habitat. Preliminary work, done prior to the issuance of the preliminary injunction by the trial court, required the use of heavy earth moving equipment, including a "ripper" and "scrapers." Levees, ditches, swales, loafing bars, and other features are to be constructed under the management plan. The existing drainage pattern will be altered, raising questions of possible resulting effects on neighboring property.[12] An existing pump is to be refurbished, 1,500 feet of new pipeline is to be laid, and flashboard risers are to be installed to provide and control water necessary for the habitat, in particular the semipermanent brood ponds. This raises legitimate questions regarding the amount and source of the water being used. New areas of standing water will be created in the form of the brood ponds, providing not only avian breeding grounds, but also new mosquito breeding habitat, raising legitimate health concerns. The increase in birdlife will also presumably attract other wildlife, including predators. Plus, the management plan calls for the planting of new riparian vegetation, including grasses and trees. Some of this vegetation may potentially spread to neighboring properties, potentially resulting in an increased use of herbicides or pesticides on neighboring properties.

The State Agencies dismiss these concerns as unsupported by the evidence. However, a party challenging what is essentially a claim of the commonsense exemption under Guidelines section 15061, subdivision (b)(3), unlike a party asserting an exception to a categorical exemption, need only make a "slight" showing of a reasonable possibility of a significant environmental impact. (*Davidon Homes, supra*, 54 Cal.App.4th at p. 117.) It is the lead agency that has the burden of establishing the commonsense exemption, i.e., that there is *no* possibility the project may cause significant environmental impacts.

---

[12] The conservation easement includes language requiring Traynham to notify the state, take immediate remedial action, compensate any affected party, and prevent any future damage if there are any water seepage problems occurring as a result of water management on the property. This is evidence the State Agencies anticipate there is at least a possibility of seepage problems.

"[T]he agency's exemption determination must be supported by evidence in the record demonstrating that the agency considered possible environmental impacts in reaching its decision." (*Id.* at p. 117; see *East Peninsula Ed. Council, Inc. v. Palos Verdes Peninsula Unified School Dist., supra,* 210 Cal.App.3d at p. 171.)

Here the administrative record reflects the State Agencies consistently took the position the loss of agricultural land was not itself an adverse environmental impact, but the State Agencies do not point us to any evidence in the record showing they considered the potential environmental impacts from the management plan and the construction and maintenance of this new habitat. "[I]t cannot be assumed that activities intended to protect or preserve the environment are immune from environmental review. [Citations.]" (*Davidon Homes, supra,* 54 Cal.App.4th at p. 119; see, e.g., *Dunn-Edwards Corp. v. Bay Area Air Quality Management Dist.* (1992) 9 Cal.App.4th 644 [11 Cal.Rptr.2d 850], disapproved on other grounds in *Western States Petroleum Assn. v. Superior Court, supra,* 9 Cal.4th 559, 570.) There may be environmental costs to an environmentally beneficial project, which must be considered and assessed. The State Agencies have not adequately shown there is "no possibility" this project, considered as a whole (see Guidelines, § 15378, subd. (a)), may cause significant environmental impacts. Therefore, we do not need to reach the issue of whether a change in use of land from agriculture to habitat will itself otherwise trigger CEQA.

We conclude, despite the intended beneficial environmental purpose of this project, it is not categorically exempt from CEQA. Nor does it fall within the commonsense exemption to CEQA. The WCB, as the lead agency, must conduct an initial study to determine if the project may have a significant effect on the environment. We shall affirm the trial court's grant of a peremptory writ of mandate setting aside the WCB's decision finding this project exempt from CEQA, requiring any future approvals of the project to be made in compliance with CEQA, requiring the condition of the property as it existed prior to the WCB's approval of the project on February 28, 2002, to be used as the baseline for the environmental review, and prohibiting all activity relating to the project until such time.

## II.

### Award of Attorney Fees*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante,* page 173.

## DISPOSITION

The judgment granting a peremptory writ of mandate and the orders granting attorney fees are affirmed. Respondents are awarded their costs on appeal. (Cal. Rules of Court, rule 27(a).)

Scotland, P. J., and Hull, J., concurred.