[No. G036991. Fourth Dist., Div. Three. Jan. 31, 2007.]

MERRILEE MADRIGAL et al., Plaintiffs and Appellants, v.
CITY OF HUNTINGTON BEACH, Defendant and Respondent;
LANDSCAPE BY HIRO, INC., et al., Real Parties in Interest and
Respondents.

## COUNSEL

Law Office of Rose M. Zoia, Rose M. Zoia; Briggs Law Corporation and Cory J. Briggs for Plaintiffs and Appellants.

Jennifer McGrath, City Attorney, and Scott F. Field, Assistant City Attorney, for Defendant and Respondent.

Latham & Watkins, Paul N. Singarella, Daniel P. Brunton, Joshua T. Bledsoe; Donald A. Redd and Douglas P. Ditonto for Real Party in Interest and Respondent Southern California Edison.

Woodruff, Spradlin & Smart and M. Lois Bobak for Real Party in Interest and Respondent Landscape by Hiro, Inc.

OPINION

FYBEL, J.—

INTRODUCTION

■ We consider whether the trial court abused its discretion in determining the City of Huntington Beach (the City) properly issued a grading permit without conducting an environmental review of the permit's impact, pursuant to the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.). "The fundamental purpose of CEQA is to ensure 'that environmental considerations play a significant role in governmental decision-making' [citation]." (*Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 797 [187 Cal.Rptr. 398, 654 P.2d 168].) "CEQA must be interpreted to afford the fullest possible protection to the environment within the reasonable scope of statutory language. [Citation.]" (*Day v. City of Glendale* (1975) 51 Cal.App.3d 817, 823 [124 Cal.Rptr. 569].)

The City found the entire project was exempt from compliance with CEQA because it involved a minor alteration to land, and issued a notice of exemption at the same time it issued a conditional use permit (CUP) for the project. (Cal. Code Regs., tit. 14, § 15304, subd. (a).) (All further references to title 14 are to title 14 of the California Code of Regulations.) The exemption finding was never challenged. Merrilee Madrigal, the Santa Ana River Watershed Coalition, and the HB River Park Foundation (collectively Madrigal) challenged the later issuance of a grading permit, on the grounds (1) the permit was inconsistent with the CUP and (2) the issuance of the permit was not exempt from CEQA compliance and required environmental review. Madrigal petitioned the trial court for a writ of mandate; the trial court entered judgment denying the petition, finding the City did not abuse its discretion in issuing the grading permit without conducting an environmental review.

We affirm. The grading permit was consistent with the CUP. The CUP contemplated the use of fill as part of the grading process, although no specific amount of fill was mentioned at that time. The fact two different grading plans, prepared six years apart, estimate two different amounts of fill does not mean either of the grading plans was inconsistent with the CUP. The grading permits issued in connection with those grading plans were also consistent with the CUP.

Additionally, Madrigal did not meet the burden on appeal of proving that the issuance of the grading permit was discretionary, rather than ministerial, or that it was not otherwise exempt from CEQA.

STATEMENT OF FACTS

The property in question is located in Huntington Beach, north of Atlantic Avenue, between the Santa Ana River and a residential tract. Southern California Edison (SCE) owns the property and SCE's power lines cross above it. In June 1996, the predecessor in interest of Landscape by Hiro, Inc., entered into a license agreement with SCE to use the property for horticultural and agricultural purposes.

On June 20, 1996, Hiro Kawachi applied to the City for a CUP to operate a wholesale nursery on the property. On June 24, Kawachi submitted a proposed land use plan for the nursery. In response to a request for more information, Kawachi advised the City he planned to "eliminate the areas of flooding [on the property] by adding or scraping away soil." Kawachi also explained the area would be graded and a drainage system installed, over the course of several years, in stages of 500 feet per stage.

The City conducted public hearings on Kawachi's CUP application. At a public hearing on September 4, 1996, Kawachi explained, "[t]he project will be implemented over the next five (5) years in 500 foot sections," and he would "use a 10 wheel truck to bring in the dirt for grading."

At a September 18, 1996 hearing, the City's staff circulated a detailed written summary of the project, which contained the following relevant language: "*Project Implementation*: Applicant proposes to prepare the site incrementally, approximately 500 linear feet each year over a four to five year period. Initially, some other site preparation will be required . . . . [¶] *Step 1*: Along westerly edge, flatten grade for entire length of project site for location of drainage pipe. There will be no export or import of soil for this step. This will eliminate ponding condition for 80 percent of the site. Approximate duration: Two months. [¶] *Step 2*: Prepare area where office and storage trailers and parking will be located at Atlanta end of site. Applicant expects approximately 50 truck trips to/from site for import/export of soil. (All trips planned using a 10 wheel truck.) Approximate duration: One month. Note this work will overlap slightly with Step 1. [¶] *Step 3-7*: Prepare 500 linear feet of area for plant material. Applicant expects approximately 100–150 truck trips for each of these steps. Approximate duration for each step: Nine to 12 months. Project to be completed in four to five years."

At the conclusion of the hearing, the City approved CUP No. 96-45, which specified that the proposed land use plan submitted by Kawachi "shall be the conceptually approved layout" with certain modifications not relevant to the present dispute. The CUP was issued with conditions, including a requirement that a grading plan be submitted for approval. The City also issued a notice of

action, which included a finding that the "proposed use will improve ponding and flooding conditions which now occur on the site and impact the adjacent residential properties by grading the site and installing a drainage pipe to accommodate runoff."

At the same time it issued the CUP, the City found the project exempt from CEQA because it involved only minor grading without the construction of any permanent structures. (Tit. 14, § 15304, subd. (a).) The City filed a notice of exemption on September 30, 1996. The filing of the notice of exemption triggered the 35-day statute of limitations to institute an action challenging the finding that the project was exempt from CEQA (Pub. Resources Code, § 21167, subd. (d)); no challenge was filed.

On July 31, 1998, Kawachi submitted the grading plan required by the CUP (the 1998 grading plan). On August 14, 1998, the City approved Kawachi's grading plan and issued a grading permit (the 1998 grading permit). By April 1999, Kawachi had completed the first two steps identified in the project summary. The City advised Kawachi he could complete the remaining steps "at [his] leisure."

In 2003, Kawachi resumed grading for the nursery. In May 2003, the City issued a stop-work notice to evaluate the grading, in response to complaints from Merrilee Madrigal. The City compared the as-built survey with the 1998 grading plan, and determined the completed work was not in compliance with the 1998 grading plan. The City instructed Kawachi to obtain a new grading permit to bring the site into compliance. In May 2004, Kawachi prepared a new grading and drainage plan (the 2004 grading plan). The City approved the 2004 grading plan, which referenced 4,046 cubic yards of earth fill to be imported to the site. On August 13, 2004, the City issued a new grading permit (the 2004 grading permit).

Merrilee Madrigal complained to the City about the amount of imported fill envisioned by the 2004 grading plan. The City's civil engineer concluded the 2004 grading plan was consistent with the CUP: "After review of previously submitted site plans, project descriptions and grading plans, the City has determined that even though Hiro's Nursery has imported 4,046 cubic yards of soil, the project is in substantial compliance with the approved Conditional Use Permit."

Merrilee Madrigal filed a petition for writ of mandate on February 9, 2005. An amended petition was filed on March 17, 2005, adding the Santa Ana River Watershed Coalition and the HB River Park Foundation as petitioners.

The petition alleged the approval of the 2004 grading permit violated CEQA and the Huntington Beach Municipal Code. After a hearing on January 13, 2006, the court entered judgment denying the petition. Madrigal appealed.

DISCUSSION

I.

STANDARD OF REVIEW

"In any action or proceeding . . . to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with [CEQA], the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (Pub. Resources Code, § 21168.5.) On appeal, our standard of review is the same as that of the trial court. (*El Dorado County Taxpayers for Quality Growth v. County of El Dorado* (2004) 122 Cal.App.4th 1591, 1596 [20 Cal.Rptr.3d 224].)

II.

MADRIGAL HAS FAILED TO ESTABLISH THE CITY ABUSED ITS
DISCRETION IN ISSUING THE 2004 GRADING PERMIT WITHOUT
PERFORMING AN ENVIRONMENTAL REVIEW.

■ For purposes of CEQA, a "project" is "the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and that is any of the following: [¶] . . . [¶] . . . An activity involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (Tit. 14, § 15378, subd. (a)(3).) The issuance of a CUP for a site-specific development proposal is a "project." (*Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1315 [8 Cal.Rptr.2d 473].)

In this case, the project is the development of a nursery, including but not limited to grading, which was approved by the CUP. Based on the record, the use of fill as part of the grading process was unquestionably contemplated at the time the CUP issued, although at that time no amount of fill was specified. The use of fill on this property could have been challenged when

the notice of action on the CUP issued. No such challenge was ever made, and the statute of limitations to bring such a challenge has long since expired.

The 1998 grading permit and the 2004 grading permit issued by the City are not separate projects. They are separate steps in the completion of the nursery development project. As long as the 1998 grading permit and the 2004 grading permit authorized the work contemplated by the grading plans, and the grading plans were consistent with the CUP, there is nothing to challenge under CEQA at this time. The City determined the grading plans were consistent with the CUP, and Madrigal has not presented any evidence that this is incorrect. Madrigal compares the amount of fill contemplated by the 1998 grading plan and 2004 grading plan and argues, accurately, that 4,046 cubic yards of fill is more than zero yards of fill. But there is no reason both fill amounts cannot be consistent with the CUP, which contemplated an unspecified amount of fill.

Although the 1998 grading plan estimated the same amounts of cut and fill, 800 cubic yards each, which would presumably require neither import nor export of soil, the 1998 grading plan did not discount the need for import of soil. Under the heading "Grading Notes," the 1998 grading plan reads "[i]mport soil shall be granular material with low expansion potential and shall be compacted to at least 90%." If no soil was ever to be imported, there would be no need to include such a reference. The 2004 grading plan notes the need to import 4,046 cubic yards of fill. Madrigal's petition centers on this change. But Madrigal fails to explain why either is inconsistent with the CUP.

The chronology is as follows: The CUP issued, with the City having concluded the project was exempt from CEQA compliance since it involved grading on land with a slope of less than 10 percent. (It is the slope of the land, not the amount of fill or excavation, that makes a grading project minor under tit. 14, § 15304, subd. (a).) The CUP contained conditions, one of which was that Kawachi submit a grading plan. Kawachi submitted the 1998 grading plan, which included an estimate that no fill would be needed for the grading process. The 1998 grading plan was approved by the City without conditions, and the 1998 grading permit issued. Kawachi performed some of the work set out in the 1998 grading plan. After comparing the 1998 grading plan with an as-built survey prepared by Kawachi's engineer, the City determined the project was not in compliance with the 1998 grading plan, and required Kawachi to prepare a new grading plan and obtain a new grading permit. The City did not determine the project was not in compliance with the CUP, nor did the City determine the amount of fill on the property violated

the CUP or the 1998 grading permit. Kawachi then prepared and submitted the 2004 grading plan, which was also approved by the City without conditions, and the 2004 grading permit issued.

From all the evidence referenced in this section, Madrigal asks us to draw the conclusion that "the 2004 grading plans are not consistent with the CUP." This conclusion is completely unsupportable.

### III.

#### WAS THE ISSUANCE OF THE 2004 GRADING PERMIT A MINISTERIAL ACT?

■ Madrigal argues the issuance of the 2004 grading permit was a discretionary, not a ministerial, act and therefore was not exempt from CEQA compliance. CEQA does not apply to "[m]inisterial projects proposed to be carried out or approved by public agencies." (Pub. Resources Code, § 21080, subd. (b)(1); see also tit. 14, § 15268, subd. (a).)

A discretionary project "requires the exercise of judgment or deliberation when the public agency or body decides to approve or disapprove a particular activity, as distinguished from situations where the public agency or body merely has to determine whether there has been conformity with applicable statutes, ordinances, or regulations." (Tit. 14, § 15357.) A ministerial project "involv[es] little or no personal judgment by the public official as to the wisdom or manner of carrying out the project. The public official merely applies the law to the facts as presented but uses no special discretion or judgment in reaching a decision. . . . A building permit is ministerial if the ordinance requiring the permit limits the public official to determining whether the zoning allows the structure to be built in the requested location, the structure would meet the strength requirements in the Uniform Building Code, and the applicant has paid his fee." (Tit. 14, § 15369.)

"The determination of what is 'ministerial' can most appropriately be made by the particular public agency involved based upon its analysis of its own laws, and each public agency should make such determination either as a part of its implementing regulations or on a case-by-case basis." (Tit. 14, § 15268, subd. (a).) SCE argues that the City's treatment of the 2004 grading permit as ministerial should be accorded deference by this court. But the City never made a finding, either generally or specifically in this case, that the issuance of the 2004 grading permit was ministerial. This is exactly what the court in *Day v. City of Glendale, supra*, 51 Cal.App.3d 817 cautioned against.

In *Day v. City of Glendale, supra*, 51 Cal.App.3d at page 819, the real parties in interest obtained a grading permit from respondent City of Glendale. The appellants argued the respondent should have conducted an environmental review, since the grading permit "authorize[ed] the [real parties in interest] to fill canyons on the Hensler and MacDonald land with 1,556,000 cubic yards of material to be excavated in the highway construction project. The permit also authorized grading and movement of 343,000 cubic yards of material to be cut from a ridge to form a notch—420 feet wide at the top, 70 feet wide at the bottom, and flanked by one-to-one grade slopes cut from 100 to 200 feet—which would permit the extension of an adjacent Glendale street into the leveled Hensler and MacDonald land." (*Id.* at pp. 819–820.) The trial court found the issuance of a grading permit was a ministerial act and therefore exempt from CEQA, regardless of the overall impact of the actions authorized by the grading permit. (51 Cal.App.3d at pp. 820–821.) The appellate court, however, concluded the project was not exempt from CEQA because discretion had been exercised in issuing the grading permit with conditions (51 Cal.App.3d at p. 823) and because "[a]ll parties agree that the grading project will have a significant effect on the environment" (*id.* at p. 824). The appellate court rejected the argument that the project had to be ministerial and thus exempt from CEQA because the respondent had determined the issuance of grading permits was ministerial: "This argument, if valid, would eviscerate CEQA, a result clearly not intended by the Legislature." (51 Cal.App.3d at pp. 821–822.)

██ Issuance of a grading permit is neither necessarily ministerial nor discretionary. Here, the 2004 grading permit did not issue with any conditions. The Huntington Beach Municipal Code, of which we shall take judicial notice,[1] appears to vest in the City, through its public works department, the discretion to deny a requested grading permit. (Huntington Beach Mun. Code, ch. 17.05, § 17.05.170.) SCE argues that the City's discretion was circumscribed by the documents provided before the CUP issued. As SCE argues, the City could issue a grading permit only if the grading plan conformed to the detailed standards of the CUP.[2] Madrigal fails to establish the City

[1] Madrigal requests us to take judicial notice of chapter 17.05 of the Huntington Beach Municipal Code, citing Evidence Code sections 452, subdivision (b), and 453. No other party opposed the request. Because this chapter of the municipal code meets the definition of section 452, subdivision (b), and Madrigal complied with section 453, we grant the request for judicial notice.

[2] "A request for changes in conditions of approval of a conditional use permit or variance, or a change to development plans that would affect a condition of approval shall be treated as a new application. A request for changes to plans which will not affect a condition of approval may be approved . . . if the change is not substantial, use of property remains the same, the revision results in an improved development, and the density remains the same." (Huntington Beach Zoning & Subdivision Ord., tit. 24, § 241.18, subd. A.)

exercised any discretion in issuing the 2004 grading permit. Therefore, we cannot conclude the issuance of the grading permit was a discretionary act by the City.

## IV.

### IS THE ISSUANCE OF THE 2004 GRADING PERMIT CATEGORICALLY EXEMPT FROM CEQA?

The California Code of Regulations contains numerous examples of projects that are exempt from compliance with CEQA.[3] In this case, the notice of exemption stated the entire project was exempt from CEQA because it fell within the categorical exemption for minor alterations to land. (Tit. 14, § 15304, subd. (a).)[4]

■ "Exemption categories are not to be expanded beyond the reasonable scope of their statutory language." (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 125 [65 Cal.Rptr.2d 580, 939 P.2d 1280].) In *California Farm Bureau Federation v. California Wildlife Conservation Bd.* (2006) 143 Cal.App.4th 173, 192 [49 Cal.Rptr.3d 169], the appellate court interpreted title 14, section 15304, subdivision (d), which exempts from CEQA minor alterations to land for improvement of existing wildlife habitats. The court concluded the exemption did not apply to a project which "calls for, among other things, a change in both the height and slope of existing levees, the construction of new permanent interior levees to replace small rice dikes, the construction of 30- to 80-foot wide and one- to two-foot deep swales or channels meandering throughout the property, the digging of ponds of up to three feet in depth in addition to the swales, the construction of 20- to 60-foot long and 10- to 30-foot wide loafing bars, plus some higher mounds for duck blinds, the construction of a catch basin, using the excavation spoil to construct what will become underwater berms and hummocks, the installation of 1,500 feet of pipeline plus a number of flashboard risers, and the planting of new riparian vegetation, including trees. The work will result in 15 acres of new semi-permanent ponds, which will require regular

---

[3] Public Resources Code section 21084, subdivision (a), authorizes the creation of guidelines, including "a list of classes of projects which have been determined not to have a significant effect on the environment and which shall be exempt from" CEQA.

[4] "Class 4 consists of minor public or private alterations in the condition of land, water, and/or vegetation which do not involve removal of healthy, mature, scenic trees except for forestry and agricultural purposes. Examples include but are not limited to: [¶] . . . Grading on land with a slope of less than 10 percent, except that grading shall not be exempt in a waterway, in any wetland, in an officially designated (by federal, state, or local government action) scenic area, or in officially mapped areas of severe geologic hazard such as an Alquist-Priolo Earthquake Fault Zone or within an official Seismic Hazard Zone, as delineated by the State Geologist." (Tit. 14, § 15304, subd. (a).)

management and maintenance. The work will clearly alter existing drainage patterns and elevations of the land. It will change the nature of the land from level fields to wetlands. This is not a 'minor' physical alteration to the land as exemplified by the kinds of examples listed in section 15304." (*California Farm Bureau Federation v. California Wildlife Conservation Bd., supra,* at p. 192.)

In this case, can we say the issuance of the 2004 grading permit expands the language of title 14, section 15304, subdivision (a) beyond the reasonable scope of its language? The general definition of "grading" includes "to reduce (as the line of a canal or roadbed) to an even grade whether on the level or in a progressive ascent or descent." (Webster's 3d New Internat. Dict. (1993) p. 985.) The import or export of fill is neither required nor prohibited by the definition. The Huntington Beach Municipal Code defines "grading" as "any excavating or filling or combination thereof." (Huntington Beach Mun. Code, ch. 17.05, § 17.05.040, subd. (u).) This definition permits both excavation and fill.

■ So grading by use of imported fill can be a minor alteration in the condition of land under title 14, section 15304, subdivision (a). As the courts in *Day v. City of Glendale* and *California Farm Bureau Federation v. California Wildlife Conservation Bd.* teach us, even if a project meets the strict definition of an exemption, its environmental impact might not be minor. In this case, however, we cannot say as a matter of law that the actions contemplated by the 2004 grading permit are other than minor. Assuming that in excess of 4,000 cubic yards of fill have been imported to the property, nothing in the administrative record (other than Madrigal's unsupported statements) establishes the significance of that amount of fill. The property in question is approximately 2,200 feet by 195 feet. Madrigal has not met the burden on appeal of proving the City erred in issuing the grading permit without conducting an environmental review, because Madrigal has not demonstrated that, as a matter of law, the environmental impact of the fill is so significant that it is not a minor alteration to the property.

■ We give no weight to Madrigal's reference to the project site as a floodplain or wetlands. When a public agency determines a project is categorically exempt from CEQA, the determination constitutes an implied finding that none of the exceptions exists. (*Association for Protection etc. Values v. City of Ukiah* (1991) 2 Cal.App.4th 720, 730–731 [3 Cal.Rptr.2d 488]; *Centinela Hospital Assn. v. City of Inglewood* (1990) 225 Cal.App.3d 1586, 1599–1600 [275 Cal.Rptr. 901].) Title 14, section 15304, subdivision (a) exempts grading on land with a slope of less than 10 percent from CEQA compliance, except when the project is in a waterway or a wetland (among other specific exceptions). Here, when the City issued the CUP and concluded

the project was exempt under title 14, section 15304, subdivision (a), it impliedly found the property was neither a wetland nor a floodplain. The time to challenge this implied finding has long since expired.

DISPOSITION

The judgment is affirmed. Respondents to recover their costs on appeal.

Sills, P. J., and Rylaarsdam, J., concurred.